Filed 10/6/10          NO. 4-08-0758

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,    )    Appeal from
          Plaintiff-Appellee,           )    Circuit Court of
          v.                            )    McLean County
JEFFREY PELO,                           )    Nos. 06CF581
          Defendant-Appellant.          )        06CF679
                                        )
                                        )    Honorable
                                        )    Robert L. Freitag,
                                        )    Judge Presiding.

_____

          JUSTICE STEIGMANN delivered the opinion of the court:

          In June 2006, the State charged defendant, Jeffrey

Pelo, a Bloomington police sergeant, with 37 counts of criminal

conduct originating from two separate cases (McLean County case

Nos. 06-CF-581 and 06-CF-679).  Specifically, the State alleged

that between December 2002 and June 2006, defendant committed a

series of crimes involving the stalking, intimidation, home

invasion, residential burglary, unlawful restraint, and aggra-

vated criminal sexual assault of five women from the Bloomington-

Normal community.

          In June 2008, a jury convicted defendant of all 37

counts.  Following an August 2008 sentencing hearing at which the

trial court (1) merged several of defendant's convictions pursu-

ant to the one-act, one-crime rule and (2) imposed several

statutorily mandated sentencing enhancements, the court sentenced

defendant to a series of consecutive terms of imprisonment, totaling 440 years.

Defendant appeals, arguing that (1) the trial court erred by (a) allowing the State to introduce into evidence dozens of exhibits involving, among other things, graphic pornographic images and text, including depictions of rape, found in defendant's home computer, (b) denying his motion for change of venue, (c) excluding the testimony of his expert witness, and (d) failing to question jurors regarding the presumption that he was innocent until proven guilty; (2) the State failed to prove beyond a reasonable doubt that he sexually assaulted one of the victims, A.M.; and (3) his sentencing enhancements for the aggravated criminal sexual assaults against victims K.H., A.L., and S.K. violate the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, §11). Because we agree only that defendant's last argument requires remand, we affirm in part, vacate in part, and remand with directions.

I. BACKGROUND

A. The Charges in This Case

1. Case No. 06-CF-581

In June 2006, the State charged defendant with (1) attempt (residential burglary) (720 ILCS 5/8-4, 19-3(a) (West 2006)), alleging that defendant attempted to gain entry into J.P.'s residence with the intent to commit a felony or theft and

(2) stalking (720 ILCS 5/12-7.3(a)(2) (West 2006)), alleging that defendant "followed and/or surveilled" J.P. on at least two separate occasions, placing her in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint.  These offenses allegedly occurred in 2005 and 2006.

### 2. Case No. 06-CF-679

In August 2006, the State charged defendant with 35 counts involving crimes it alleged that he committed against S.K., A.L., K.H., and A.M., which took place between December 2002 and June 2006.

### a. The Counts Involving S.K.

The State charged defendant with home invasion (720 ILCS 5/12-11(a)(1), (a)(3) (West 2006)), in that he entered S.K.'s home with a firearm and knife, threatening S.K. with the imminent use of those weapons (counts I and II); aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1), (a)(8) (West 2006)), in that he sexually penetrated S.K.'s vagina and anus by the use of force, while armed with a firearm and knife (counts III through XX); (3) residential burglary (720 ILCS 5/19-3(a) (West 2006)), in that he entered S.K.'s home with the intent to commit a felony (count XXI); (4) aggravated unlawful restraint (720 ILCS 5/10-3.1(a) (West 2006)), in that he unlawfully de-tained S.K. with a firearm or knife (count XXII); and (5) intimi-dation (720 ILCS 5/12-6(a)(1) (West 2006)), in that he threatened

- 3 -

to harm S.K.'s family if she reported the sexual assault (count XXIII).

b. The Counts Involving A.L.

The State charged defendant with (1) home invasion (720 ILCS 5/12-11(a)(1) (West 2006)), in that he entered A.L.'s home and threatened her with a knife (counts XXIV); (2) aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West 2006)), in that he penetrated A.L.'s vagina, while threatening her with a knife (count XXV); (3) residential burglary (720 ILCS 5/19-3(a) (West 2006)), in that he entered A.L.'s home with the intent to commit a felony (count XXVI); and (4) aggravated unlawful restraint (720 ILCS 5/10-3.1(a) (West 2006)), in that he detained A.L. at knifepoint (count XXVII).

c. The Counts Involving K.H.

The State charged defendant with (1) aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1), (a)(8) (West 2006)), in that he sexually penetrated K.H.'s vagina by the use of force, while armed with a firearm and an object that he led K.H. to believe was a dangerous weapon (counts XXVIII through XXXI).

d. The Counts Involving A.M.

The State charged defendant with (1) aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West 2006)), in that he sexually penetrated A.M.'s vagina by the use of force, while armed with a knife and an object he led A.M. to believe was a

dangerous weapon (counts XXXII through XXXV).

In October 2006, the State filed an amended motion for joinder and consolidation in both cases (case Nos. 06-CF-581 and 06-CF-679), which the trial court later granted.

### B. Pretrial Issues in This Case

Prior to defendant's jury trial, which began in May 2008, the trial court addressed, in pertinent part, (1) defendant's request (a) for a change of venue and (b) to limit the State's evidence and (2) the State's request to bar defendant's eyewitness-identification expert.

### 1. Defendant's Request for a Change of Venue

In February 2008, defendant filed a motion for change of venue, asserting that the "substantial publicity *** in the local print and electronic media, circulated [and] broadcast [in the] county, *** aro[used] and incite[d] the passions of the community to [his] prejudice."  Following a March 2008 hearing, the trial court denied defendant's motion without prejudice, explaining its ruling as follows:

> "[T]he [c]ourt has a duty to *** ensure
> that *** defendant receives a fair trial.
> That *** includes a trial in front of a fair
> and impartial jury.  ***
>
> [However], the mere fact that there has
> been potentially harmful publicity in the

community in and of itself *** does not establish that there is community prejudice sufficient to warrant a change of [venue]. ***  [The court] think[s] it is *** clear *** that jurors are not required to be completely ignorant of the case; but rather, *** it must be shown that the jurors may set aside any impressions or opinions that they may have *** and render a verdict based only on the evidence presented at trial.

***

The other principle *** [that] the [c]ourt is required to be guided by *** is that *** examination of the prospective jurors is the best way, the most valuable [way to] determin[e] whether *** pretrial publicity has rendered a fair trial in a certain location to be impossible.

*** [T]he [c]ourt's belief [is] that <u>voir</u> <u>dire</u> is intended to do just that, [which] is to ensure that those jurors who are selected and sworn to hear the evidence are not going to be influenced by any pretrial publicity.  ***

***

The [c]ourt does not believe that the subject matter of publicity [that] has been presented in this case *** indicates that it would be impossible to find 12 jurors and several alternatives *** from this county, but of course[,] the [c]ourt can't hold that because we haven't begun the selection of the jurors yet. ***

For all those reasons, the [c]ourt does not believe that the granting of a motion for a change of [venue] is appropriate at this time. The motion for change of [venue] is denied. With regard to that motion, of course, *** defendant has the right to renew that motion ***."

2. Defendant's Request To Limit the State's Evidence

In November 2007, the State filed a motion in limine, seeking to use evidence of defendant's "other misconduct," which included pornography recovered from defendant's home computer, to show defendant's identity; motive; intent; modus operandi; the existence of a common scheme, plan, or design; or continuing narrative. Specifically, the State sought permission to intro-duce evidence related to case Nos. 06-CF-581 and 06-CF-679--that

- 7 -

is, evidence of all the charges against defendant and other related misconduct--interchangeably because all of the incidents (1) involved (a) similar victims; (b) restraint of the victim; (c) prior surveillance; (d) the use of similar equipment, tools, and habiliments; (e) a linear progression of time spent at the crime scene; and (f) a suspect who was wearing similar clothing, and (2) occurred at approximately the same time of day.

Defendant broached the other-bad-acts evidence issue at a hearing on several pending motions, as follows:

> "[The State] *** filed a motion to let it in. [T]he first thing I was going to address here was that [the State] need[s] to identify what information they are going to try to bring in to show identity, motive, intent, modus operandi, [and] common scheme, plan[, or] design. ***
>
> I don't know how looking [at] pornography is going to tend to identify [defendant] as the attacker of these women, how it shows motive, intent, modus operandi, or any other existence of a common scheme, plan, or design. I think this motion needs to be addressed before we go to trial ***."

At a May 2008 hearing, the prosecutor responded as

follows:

> "[I]t is the State's intention to show[-
> ,] *** through *** images on *** defendant's
> computer[,] *** motive, *** intent, *** a
> design or resolve ***, [and] modus operandi
> ***.

                    * * *

> [A]s I have presented to the [c]ourt,
> the bullet points from the four sexual as-
> saults in this case [(case No. 06-CF-679)],
> *** from the way those assaults occurred
> [and] the items that we have found and lo-
> cated on *** defendant's computer, he was
> acting in a very [specific] capacity.  ***
> [T]he ones that stands out the most [is
> K.H.'s].  She was assaulted back on April
> 4[,] 2003.  During that time, *** defendant
> had her remove the duct tape that he had
> placed on her and instructed her to put her
> finger in her vagina, [and] told her to put
> in the vibrator ***[.]  [H]e also made the
> statement [that he wanted] her to do those
> acts because it gets him off.  When you look
> at the images that were located on *** defen-

- 9 -

dant's computer, the endless streams of individuals *** having items inserted into them, *** female masturbation, it was certainly something that he was interested in [and] enjoyed watching, not only on the computer, but also during the acts when these sexual assaults were committed. Numerous images on the computer *** are images of foreign objects being placed inside of the women. And in *** [S.K.'s] assault[], *** [a] vibrator was used. He forced her to use her hand. And, [in the case of A.L.], asked her for sex toys[,] said he enjoyed penetrating masturbation by women, [and] mentioned a beer bottle to be used on her. And [the court] can see images on these exhibits *** where *** beer bottles *** were being used. In each of the four assaults [in case No. 06-CF-679] *** weapons were being displayed ***. *** [S]pecific graphic images of forced fellatio [show] *** a knife [being] held to the victim's head and [in] another a gun is held to the victim's head. And that[] specifically happened in these cases. *** I submit to

the [c]ourt that *** what the images show on the computer is just as he directed the victim. This is what he enjoyed. This is what gets him off, and what he was [looking at] on the computer [was] the same [thing] he was doing with these victims.

Again, every one of the victims were bound, attempted to be bound, ropes around their necks. *** And when [the court] look[s] at the images on the computer, just about every one of the forced sex categories has the women, not only bound, but [also] ropes and bindings around their neck. In *** one video, it showed two women being bound. [During A.M.'s attack], he was asking constantly about her roommate and asking where she was at[,] *** comment[ing] *** that if the roommate was home, he would do the same thing to her. ***

As for the videos that showed the forced witness, the State believes that those videos are important [because] *** each time *** defendant raped these four victims, he constantly was asking them about boyfriends and

asking them specifically about others that they were involved with.  And when [S.K.] was trying to speak with him, trying to show that she was a human being and not just an object, she was referring to her upcoming wedding. And when *** defendant heard this ***, *** he seemed to get very happy that a third party was going to be devastated by his actions. And I think that *** the videos that he was watching [show that] he did enjoy devastating, not only his victims, but also the victim[s'] families and those around [them]. ***  And again, *** covers were put over [the victims'] heads, pillowcases, pillows to blind them.  [There were] numerous images *** showing the same type of activity.  [A]gain, weapons were used in each [assault], knives or pistols or, on more than one occasion, both of those were used.  These images[] *** show a common design, a common scheme in *** defendant's activities.  And we do feel that they are relevant and more probative than prejudicial on these select images as to the conduct of *** defendant engaged in [the]

aggravated criminal sexual assaults against these victims."

The defense responded as follows:

"The State referred to several reasons for bringing [in] this type of evidence. First of all, [the State] mentioned motive. Motive is a reason why some[one] does something. *** These images do not relate to motive in any way. Intent is used to show lack of mistake or accident. Some[one] obviously contemplates something. *** Again, watching a video does not go to intent.

[There] is not anything really unique about the videos or the assault[s] which is going to be showing modus operandi.

And for identity, *** nothing in these videos helps the State identify [defendant] as being the attacker of any one of these women.

* * *

Not only does the State have a problem [with] not being able to show the images were viewed *** by *** defendant ***, all they can [prove] is that the images were found on a

computer located in his home and that he wasn't at work [at that time]. *** [L]ooking at the *** computer images, [even] if [the State] can *** prove [defendant looked at these images], [l]ooking at those images does not tend to prove or disprove or make more likely or less likely that he sexually assaulted any of the complaining witnesses and should be excluded."

After a short recess to consider counsel's arguments, accompanying motions, and pertinent case law, the trial court made the following ruling:

"With regard to the [State's] motion regarding computer evidence, the [c]ourt has carefully considered all of the evidence presented today ***.

The issue is similar [to each] of the issue[s from] the [series of] earlier motion[s] and that is whether *** evidence of other bad acts is admissible in this case. *** [T]his is obviously not a situation where the State is seeking admission of this evidence under the propensity statute[.] *** [H]ere[,] we're talking about what can be

- 14 -

termed *** bad acts or other conduct[, which is] the alleged viewing of various types of pornography on a home computer.

* * *

*** [T]here are certainly similarities in each of the charged offenses. There are factors that are common to all of them and primarily those involving the victims being bound in some way. Obviously, force being used, objects being used, and weapons being used, either knives or firearms. Those common elements are present in all four [assaults].

*** The evidence itself, the pornography ***, much of what was presented today has elements that are common with those elements found in the offenses here, specifically[,] *** bondage, use of weapons, use of objects, and *** use of force. In very carefully considering all of those factors, the first question the [c]ourt has to decide is whether the evidence offered is relevant ***. The [c]ourt believes that the evidence presented by the State here today, the pornography

evidence, is relevant to those aspects that are shared by some of the items presented in the offense[s] here; that being, specifically, the forced sex or rape websites and photographs, the bondage, the use of foreign objects, and *** the viewing of female masturbation. Those are all common elements between the *** tendered or proffered evidence and the evidence of the offenses. ***

There are some items that are being offered, however, that [the court does not] think are relevant. [Specifically,] those websites and the videos that had to do with *** forced witness ***. Those videos called [']forced witness['] as well as the video that ended with a shower scene ***, the [c]ourt just doesn't see that as relevant. ***

So the bottom[-]line ruling is that [the court] *** find[s] that those sites and photographs and images that have to do with forced sex, rape, bondage, the use of foreign objects, and observations of female masturbation are relevant. The others regarding

forced witnesses and the shower video are not relevant to the charges.

[T]hat leaves us with the question [of whether] *** the probative value of those items [is] outweighed by its prejudicial [e]ffect[.] Obviously, the introduction of these items would have some prejudicial [e]ffect. *** Otherwise, the State wouldn't be seeking to introduce it. *** The [c]ourt believe[s] that the probative value is high. The prejudicial [e]ffect is also high. And so the balancing has to be done very care-fully.

\* \* \*

[Having] go[ne] through all of the case law *** and [having] weighed the prejudicial effect of the photographs against their pro-bative value. *** After carefully consider-ing it, the [c]ourt believes that the proba-tive value of these websites and photographs does, in fact, outweigh the prejudicial [e]ffect of their admission in this case. With the exception of those that [that court] ha[s] indicated are not relevant, the [c]ourt

will allow the [State's] motion in limine ***. The [c]ourt will deny the motion as it pertains to those items from the forced witness websites and the video involving the shower."

### 3. The State's Request To Bar Defendant's Expert

In March 2008, the State filed a motion in limine, seeking to bar defendant's eyewitness identification expert, Dr. Solomon Fulero. Specifically, the State requested, in pertinent part, that the trial court bar Fulero from testifying because Fulero's testimony would not aid the trier of fact in rendering its verdict. In April 2008, defendant responded, arguing that Fulero would aid the jury because issues with mistaken identification were a general problem in criminal trials, particularly in cases involving sexual assault.

Following an April 7, 2008, hearing on the State's motion to exclude Fulero, the trial court found as follows:

"With regard to the other argument the State has presented that expert testimony is generally not admissible in the area of eyewitness identification[,] *** the Illinois Supreme Court and the reviewing courts have cautioned trial courts in allowing expert testimony in this area. *** I am not certain

- 18 -

that it should be characterized as the State
has in that the rule is that it is not gener-
ally admissible. [R]ather[,] the recent
cases indicate that trial courts need to be
very cautious about allowing such evidence
because *** it tends to invade the province
of the jury in determining credibility of
witnesses. *** There has been some evidence
presented about certain identification. [The
court does not] know if there is other iden-
tification that [it] hasn't heard about.

[F]rankly[, the court is] very frus-
trated at that. [The court is] at a loss in
how to *** rule on this motion without [know-
ing what] the evidence *** is going to be.

So[, the court's] ruling on the State's
[m]otion *** i[s] this; the motion is allowed
unless and until the court is presented with
certain evidence that this eyewitness expert
has real probative evidence that does not
invade the province of the jury in determin-
ing credibility of witnesses."

On April 21, 2008, defendant filed a motion to recon-
sider the trial court's order, barring Fulero's testimony. At a

hearing on that motion held three days later, the court denied

defendant's motion for failure to make a specific offer of proof.

C. Jury Selection in This Case

1. The <u>Trial</u> <u>Court's</u> <u>Admonishments</u> <u>and</u> <u>Questions</u>
<u>Related</u> <u>to</u> <u>the</u> <u>Presumption</u> <u>of</u> <u>Innocence</u>

In May 2008, the trial court addressed the parties as

follows:

"We will begin the jury[-]selection process

in this case shortly.  But before we do that,

*** we need to make a bit of a record ***.

We had a discussion regarding the jury selec-

tion process and to briefly summarize, the

[c]ourt is summoning [40] potential jurors to

the courtroom here in a few minutes.  Upon

their arrival, the [c]ourt will be engaging

in some opening remarks to the potential

jurors regarding the nature of the case,

discussing the charges that are pending,

indicating the names of potential witnesses,

and introducing the parties and the attorneys

to the jurors.  *** [W]hen the opening re-

marks are completed, the clerk will call the

names of the first four jurors on the list

that have been provided to counsel.  Those

four potential jurors will remain in the

courtroom for individual questioning by the [c]ourt and attorneys.  The remaining [36] jurors will be excused back to the jury assembly room after the [c]ourt has admonished them ***.  Those [36] jurors will remain in the jury assembly room in a separate area from the other potential jurors who are here for trial in the building today until they are needed again in the courtroom."

Shortly thereafter, the trial court explained to the 40-person pool of potential jurors, among other things, (1) what the court expected of them generally and (2) how the jury-selection process would work.  Specifically, the court explained its expectations as follows:

"Ladies and gentlemen, in this case, [defendant], as with any other person who is charged with a crime, is presumed innocent of the charges that bring him before you.  This presumption is with him now at the onset of this trial, and it will remain with him throughout the course of the proceedings ***. [This] is not overcome unless and until each of you individually and collectively are convinced beyond a reasonable doubt that ***

- 21 -

[d]efendant is guilty.  It is absolutely essential as we select this jury that each of you understands and employs these certain fundamental principles; that is, that all persons charged with a crime are presumed to be innocent.  And it is the burden of the State *** to prove *** [d]efendant guilty beyond a reasonable doubt.  What this means is that *** [d]efendant has no obligation to testify in his own behalf or to call any witnesses in his defense.  ***

The fact that *** [d]efendant chooses not to testify must not be considered by you in any way in arriving at your verdict.  ***

The bottom line, however, is that there is no burden upon *** [d]efendant to prove his innocence.  It is the State's burden to prove him guilty beyond a reasonable doubt.

* * *

The [c]ourt and counsel are going to begin questioning you in panels of four ***."

The court then seated the first four potential jurors.  As part of its questioning, the court asked the group of four, in pertinent part, the following questions, to which the jurors responded

as a unit:

> "[THE COURT: W]hen [the court] was ad-
> dressing the entire group, [it] touched on
> some general principles of the law that apply
> to all criminal cases.  Now, one of those was
> the presumption of innocence.  Do each of you
> understand and accept that this means that
> *** [d]efendant does not need to prove his
> innocence?
>
> Seeing all positive responses.
> ***
>
> [THE COURT:] Do each of you understand
> that he does not need to testify, and that if
> he chooses not to testify, that you must not
> consider that in any way in arriving at a
> verdict?  Each of you understand that?
>
> Seeing all positive responses."

The court asked the same questions to each successive group of
similarly situated potential jurors.

2. Defendant's Renewal of His Motion for Change of Venue

On the third day of jury selection, defendant exhausted
his peremptory challenges and shortly thereafter renewed his
motion for change of venue, arguing that the venire had "formed
opinions in this case."  The trial court denied defendant's

- 23 -

motion, finding as follows:

> "Thus far in the jury[-]selection process, [the court and the parties] have interviewed thirty-eight individuals.  Defendant has made a challenge for cause on several of those individuals based on what they said about opinions that they held [in light of local] media coverage.  The [c]ourt has granted several of those motions.  The [c]ourt has denied several motions for cause on the grounds that the [c]ourt found that the responses of those jurors, while they indicated they had perhaps read or heard things and formed some sort of opinion, they were either not familiar with any facts in the case, and they also indicated that they could set aside their opinions and what they may have read and still judge the case only on the law and the evidence.  The [c]ourt believes that the rulings in regard to all of those challenges for cause that were denied [were] appropriate.  And, obviously, *** defendant has used some peremptory challenges for a couple of those jurors ***.  *** [A]t

this point, [the court] think[s] the record is pretty clear that [this case] has not *** even come close to reaching the point of impossibility of selecting a fair and impartial jury in this county."

### D. Defendant's Trial

### 1. The State's Evidence

At defendant's trial--which began in May 2008--the State called more than 60 witnesses to testify that between December 2002 and June 2006, defendant--a Bloomington, Illinois, police sergeant--committed a series of signature crimes against women in the Bloomington-Normal community. The State presented evidence that defendant (1) used his resources as a police officer to discover the personal information of a number of individuals, including some of the victims; (2) ran his own license plate number following one of the sexual assaults to determine whether his vehicle had been reported; (3) viewed graphic pornography on his home computer that depicted women (a) being raped, abused, and assaulted with, among other things, beer bottles and (b) pleasuring themselves with their fingers and various sex toys; (4) had access to a hooded sweatshirt labeled "England," which he may have purchased on a family vacation to London, England, several years before the sexual assaults; (5) owned (a) black gloves with velcro wristbands, (b) rope, (c)

black ski masks, (d) a black coat, (e) folding knives, and (f) multiple guns; and (6) had (a) been seen peering into residential windows, (b) been seen driving his personal vehicle early in the morning by fellow Bloomington police officers, who described him as having acted suspiciously, and (c) followed and investigated J.K., as well as removed the screens from her apartment window.

### a. Evidence Related to A.M.

A.M. testified that in December 2002, she awoke at 4:30 a.m. to discover an intruder standing in the doorway to the bedroom of her Bloomington apartment. He was shining a flashlight at her. She "freaked out[.]" He ran over to her and covered her mouth with his hands. He put "twine" around her neck, which she convinced him to remove by promising not to scream. He then put a knife against her head and ordered her to take off her shorts and underwear. She resisted. He told her that if she did not comply, he would cut her throat. She complied, and he inserted his finger into her vagina and then performed oral sex on her. He then ordered her to roll over onto her stomach. He put his fingers into her vagina again. He said, "Tell me why I shouldn't rape you." She responded that she did not know. He abruptly stopped, told her to put her face in her pillow, said he would be "right back," and walked out of her bedroom. When she heard the apartment door shut, she locked the bedroom door and called the police. She added that at some point

during the assault, he told her that he had been (1) watching her from across the street and (2) planning to do the same thing to her roommate.

A.M. described the intruder as a white male who was wearing a black ski mask, black "Carhartt" coat, and jeans. She also told the jury that her (1) license plate at the time of the assault read "AMOJO 58" and (2) roommate's license at the time of the assault read "LACYJO 5." Those two license plates, "AMOJO 58" and "LACYJO 5," were run--for no apparent legitimate law enforcement reason--the month before A.M.'s assault by "JPELO," using the Bloomington police department's Law Enforcement Agency Data System (LEADS). That same month, someone logged in as "J. Pelo" at the Bloomington police department accessed A.M.'s parents' personal information through the National Crime Information Center (NCIC) database.

b. Evidence Related to K.H.

K.H. testified that in April 2003 she went to sleep in her Bloomington apartment around 12:30 a.m. Sometime after she went to sleep, she awoke to find an intruder standing in her doorway, shining "a small round light" on her. The next thing she knew, the man was on top of her. He put his gloved hand over her mouth and told her not to scream. He said that he did not want to hurt her, but that if she screamed, he would shoot her.

The intruder ripped the sheets from K.H.'s bed. He

- 27 -

then tied her hands behind her back with "zip ties" and rolled her over to duct-tape her mouth.  She complained that the zip ties were too tight.  He cut the zip ties off and bound her wrists with duct tape.  He also placed duct tape across her mouth, eyes, and head.  He then placed one of her pillowcases over her head.  He proceeded to suck on her right nipple.  He then licked her vagina and clitoris, placing a gun on her chest and threatening to kill her when she appeared to object.  He got off the bed, removed some of his clothes, and ripped open a package.  He got back on top of her and rubbed his un-erect penis between her legs and along her vagina.  He asked her, "Do you have a boyfriend?" "Do you shave yourself or is that for your boyfriend?" "Do you live here with anybody?" "Where does your boyfriend live?" And, "How old are you?"  She could not answer because of the duct tape on her mouth.  He stopped and stepped away.  When he came back, he was "more erect."  He then penetrated her vagina for "a few thrust[s]."

The intruder got off the bed, told K.H. to stand up, and rubbed his hands over her breasts and between her legs.  He then left the room.  He came back a short time later, took her cellular telephone off the charger, and ordered her into the bathroom.  He told her to get into the bathtub.  She complied and he cut the duct tape off of her wrists.  He turned on the water and told her to put four fingers into her vagina "as far as [she]

could put them and then to move them in and out." He told her that he liked that and then asked her if she had any dildos or vibrators. She indicated that she did. He left the bathroom and returned with a vibrator.

The intruder then inserted the vibrator into K.H.'s vagina. After some time, he took the vibrator out and placed it against her anus, asking her whether she "had ever done it there." She indicated that she had not and did not want to. He placed the vibrator back into her vagina. He then ordered her to do it to herself, instructing her to "do it hard like you like it." He added (1) that was the way he liked it and (2) she was "getting [him] off." After a while, she realized that he had left. She got out of the bathtub, cut the duct tape off of her head, and called the police from her home telephone.

K.H. further testified that the intruder was a white male who was wearing a black ski mask, a black jacket, jeans, and black gloves "like [the] kind *** football players [wear.]" When shown a photographic lineup, K.H. indicated that defendant's eyes were familiar. In response to voice exemplars, she eliminated five of the eight samples. (Defendant's voice was not one of the five exemplars she eliminated.)

The State also presented evidence to show that (1) in October 2002--six months prior to K.H.'s assault--someone logged in as "J. Pelo" at the Bloomington police department accessed

K.H.'s and K.H.'s father's personal information through the NCIC database and (2) in February 2003--two months before K.H.'s assault--someone logged in as "JPELO" accessed K.H.'s information using the Bloomington police department's LEADS system.

### c. Evidence Related to A.L.

A.L. testified that in July 2004 she was arrested for driving under the influence (DUI). Shortly after her DUI arrest, a "tall man in black" walked into her apartment between 11 p.m. and 2 a.m. She yelled, "Help!" and the man ran out the door. In the early winter of that same year, she "woke up to [find] someone on the steps *** to her apartment, which [were] right in front of the window where [she] sle[pt]." She looked out the door and yelled at the person, but she was only able to see the person's feet.

In January 2005, A.L. went to bed between 11 p.m. and midnight. She awoke to find an intruder in a ski mask standing at the end of her bed. The intruder, who had a flashlight, said he did not want to hurt her. He forced her to roll onto her stomach. She resisted, and he put a "rope cord" with a "slip knot or a double loop" around her neck. After putting the rope around her neck, he turned her onto her back, showed her a knife, and told her that he had a gun. He then bound her wrists to-gether with a zip tie. He ordered her to take off her shorts. She replied that she could not take her shorts off because her

hands were tied. He responded, "Yes, you can. I have done this before." He then assisted her in taking her shorts off and closely "examined" her pelvic area and chest. He threw her blankets and clothes off the bed and continued examining her body. He commented that she was "beautiful" and that he liked female masturbation where "the female would insert something into her vagina to manipulate herself." He also told her that (1) he had been watching her and (2) she had almost caught him trying to enter her apartment a couple of times.

The intruder asked A.L. whether she had any "sex toys, dildos, [or] vibrators." She responded that she did not. He then asked her whether she had any beer bottles. She said that she did not. He forced her to manipulate her "pelvic, clitoral area" for two or three minutes, while he watched. He next told her that it was time for "the whole thing," and she pleaded with him to use a condom. She retrieved a condom from the bathroom. He pulled his pants down and attempted to put the condom on. However, he was unable to do so because he did not have a full erection. Eventually, he was able to get the condom on his penis. He then attempted to penetrate her vagina but was having difficulty because his penis was never fully erect.

The intruder then told A.L. that she had "managed to talk [him] out of the mood." He told her to get up and "run a bath." She did, and he told her to get in and wash herself. He

then left the bathroom. After a short time, she got out of the bathtub to try to cut the zip ties off of her hands. While she was doing that, the intruder opened the bathroom door, holding a towel and her cellular telephone. He left the bathroom again. He eventually came back and cut the zip ties off her wrists. He told her not to call the police and said that he would be watching her. When she heard him leave, she called the police from her cellular phone. (He had apparently left the cellular telephone in her apartment despite having carried it into the bathroom.)

A.L. testified that the intruder was a white male who was wearing dark clothing, a ski mask, gloves with velcro wrists, and a sweatshirt with (1) a hood and (2) the word "England" on the front of it. She added that the hood of the sweatshirt was pulled over the ski mask. (To show that defendant owned such a sweatshirt, the State introduced photographs of his family wearing similar sweatshirts while on an earlier trip to England.)

A.L. identified defendant as the intruder at trial. She also identified him from both a photographic lineup and voice exemplar. Additionally, she indicated that "the walk and the gait" of the intruder were the same as defendant's based upon her observations of defendant at his arraignment in this case. The State also presented evidence that A.L.'s personal information had been accessed several times from different central Illinois

police agency terminals prior to her assault.

### d. Evidence Related to S.K.

S.K. testified that in October 2004, she arrived at her Bloomington apartment from work around 2 a.m. As she parked her car, she noticed a man walking "very slowly" away from her apartment building with his hands in his pockets. The man passed within three feet of her car and had a distinctive walk. She added that "it seemed very out of the ordinary." The next day, her roommate noticed that her bedroom window screens were missing.

On January 25, 2005, S.K. took the day off work to prepare for her wedding. She returned to her apartment from her parents' home around midnight. She went to bed at approximately 2 a.m. Around 2:45 a.m., she awoke to see someone coming into her room. The intruder told her to "shut the fuck up" and brandished a gun. He then asked her whether her roommate would be coming home. She said that she would not. Following a short struggle, the intruder put the gun to her head and ordered her to remove her clothes.

S.K. explained that the intruder was a white male who was wearing a light-colored University of North Carolina hooded sweatshirt, dark blue jeans, a black "neoprene" coat, black gloves similar to the type that "wide-receivers wear," and a black belt, adding that he appeared to be using the belt as a

utility belt for his weapons. The intruder had the hood of the sweatshirt pulled tight around his face with a black scarf covering half of his nose and all of his mouth. She recalled that the gun was silver and was not a revolver.

S.K. further testified that once the intruder removed her clothing, he began to rub her inner thighs and "look over [her] vaginal area." He bound her hands with plastic zip ties. He then put a folding knife to her throat and asked her (1) for her name and (2) who lived at 110 Doud Drive. She told him her name and said that her parents lived at that address. He responded as follows: "I know that, you didn't think I knew that. You make one more noise, you scream, I will put a bullet in your fucking head and go to your parents and finish off every single last one of them."

Shortly thereafter, the intruder pulled out a vibrator and asked S.K. if she knew where he had gotten it. She responded that she did not, and he told her that it was her roommate's. At that point, he attempted to place one of her pillowcases over her head. She "lost it," and he agreed to simply lay the pillowcase over her eyes so that she could not see him. He violently penetrated her vagina with the vibrator for several minutes. He then left the room for a short period of time. When he came back, he attempted to (1) penetrate her anally with the vibrator and (2) put a "black cord" around her neck and "use it as a

noose."

Because the intruder was having difficulty anally penetrating S.K. with the vibrator, he asked her whether she had any lubricant. She said she did not. He persisted. She indicated that she had some lotion in the bathroom. He then made her get off the bed and accompany him to the bathroom. She tried to stop him by telling him that she was pregnant. He did not respond. However, once they were in the bathroom, he asked her how long she had been pregnant. She said, "four days." He demanded to see the pregnancy test. She retrieved the pregnancy test from the bathroom trash can. After noticing her engagement ring, he asked whether her fiancé was "the person with the red car that visits [her] on the weekend." She said that he was. He claimed that he knew everything about her, telling her that he knew she worked at "The Loft," worked out at "Gold's Gym," and that her little sister looked very similar to her. He also told her that he (1) knew her schedule and (2) had been watching her come and go from her apartment. He then asked her (1) if her fiancé knew she was pregnant, (2) whether they were excited, (3) how he would feel if he knew that she was pregnant when he raped her, (4) if she would keep the baby in light of the attack, and (5) if her parents would be upset. S.K. testified that he appeared to be "elated like a little kid at Christmas, *** overjoyed that all of these other people [would] be violated."

- 35 -

He then took the lotion and S.K. back to the bedroom.

Once they were back in the bedroom, the intruder put the lotion on S.K.'s fingers and, at gunpoint and knifepoint, forced her to place her fingers in her vagina; two fingers, then three and four, and then her thumb. However, she was having trouble inserting her thumb. The intruder became angry and undid the velcro on his gloves in an effort to remove them. At that moment, she could see his face because the pillowcase had "shifted up." He began to insert his fingers into her vagina; first one, then two, three and four, and then his thumb. After doing so, he asked her (1) whether this was the bed she had gotten pregnant in and (2) what was the craziest thing she had ever done. She did not respond to either question.

The intruder then asked S.K. where she wanted to have sex, pointing first to her mouth, then to her vagina. He unzipped his pants and pulled them down around his knees. He began to rub his penis against her vagina, telling her that if she did not respond, he was going to do both. He then attempted to insert his penis into her vagina. She told him that she "would rather do it the other way." He grabbed his gun, held it to her head, cocked it by pulling back the slide, and told her that if she bit him, he would "blow her brains out." He then put his penis in her mouth, but could not become fully erect. (S.K. also noted that his penis did not seem fully erect when he was earlier

making contact with her vagina.)  He next asked whether she had any condoms.  She responded that she did not.

After removing his penis from her mouth, the intruder "got the vibrator out again" and asked S.K. whether she had any sex toys.  She responded that she did not.  He said, "Well, what about beer bottles?"  She said that she did not.  He then forced her on to her hands and knees and again violently penetrated her vaginally from behind with the vibrator.  After a while, he stopped and began anally penetrating her with the vibrator.  All the while, he was repeating the phrases, "You have a pretty pussy," and "I want to shave it."

The intruder then ordered S.K. back to the bathroom where he put her right leg up on the counter, directly in front of the mirror.  He began rubbing the outside of her vagina, attempting to insert his fingers into her vagina.  Simultaneously, he was rubbing her abdomen with his other hand, (1) asking her what her plans were for the pregnancy and (2) talking about killing her family.  After several minutes, he forced her to switch legs and then repeated the process.

After assaulting her, the intruder forced S.K. to sit in the bathtub with her feet toward the drain.  He turned the water on, spread her legs apart, put soap on her hand, and told her to insert four of her fingers in and out of her vagina rapidly until he told her she could stop.  After a while, he

knelt down next to the bathtub and told her to hold out her wrists. She complied and he cut the zip ties off with his knife. He then shut the lights off, walked out of the bathroom, and closed the door behind him. After what she thought was a couple of hours, she got out of the bathtub and met a neighbor that she had heard preparing for work in the apartment above hers. When she got out, she noticed that her clothes, her telephones, and the fitted sheet from her bed appeared to be missing. (She later discovered that her cellular telephone was not missing, but had been hidden in her apartment.)

S.K. later identified defendant in court as the intruder, and she also identified him from a photographic lineup and voice exemplar. She also told the jury that the intruder had the same distinctive walk as the man she saw walking away from her apartment in October 2005.

e. Evidence Related to J.P.

J.P. testified that on April 8, 2005, she received a number of "hang-up" calls at work, which gave her a "really bad feeling." Because of that feeling, she asked a male coworker to walk her to her car. Shortly after driving out of the parking lot, she noticed a man who had pulled his vehicle behind hers acting suspiciously. She described the man as a white male with a straight nose, "rounder" face, a "buzz cut flattop," and "big sunglasses." She identified defendant from the witness stand as

the person who appeared to be following her that day.

J.P. further testified that on April 10, 2005, she and her then-boyfriend, Scott Galuska, returned to her Bloomington home around 10 p.m. Sometime after J.P. fell asleep, Galuska woke her up and told her to call the police because he saw someone wearing black gloves standing in her yard. As J.P. called the police, Galuska ran outside with a baseball bat. Shortly thereafter, she heard Galuska and the man in the yard yelling at each other. The man eventually ran away.

Galuska testified, reinforcing J.P.'s testimony regarding the events of the night of April 10, 2005. Galuska identified defendant from a photographic lineup as the man he confronted in J.P.'s yard.

J.P. also testified about a third incident. On June 10, 2006, J.P. arrived home around midnight. Shortly after arriving home, she noticed that her dog was unusually upset, barking and growling. She then heard what she described as an "urgent" knock at the door. She responded, but no one was at the door. Shortly thereafter, her doorbell rang, and again, no one was there. She then heard a noise by the side of the house, prompting her to call the police. Officer David Ziemer responded to the call.

Ziemer testified that as he approached J.P.'s house he saw someone standing with his back against an adjacent house.

Ziemer ordered the person to walk toward him but, instead, the person turned to walk away with his hands "in his waist-band area." Ziemer pulled his service firearm and ordered the man to stop, but the person continued to walk away. However, once the man got to the back of the house, he turned and walked directly toward Ziemer. As the man approached, Ziemer recognized the man as defendant, his former supervisor and member of his softball team. Before he released defendant, Ziemer noticed that defendant had "an item of clothing or something" under his shirt.

## 2. Defendant's Evidence

Defendant did not testify in his own defense. However, defendant called several witnesses to show that (1) his brother-in-law and other family members had access to the family computer containing the pornography, (2) the victims had misidentified him as their attacker because they had been tainted in one way or another by the media coverage, (3) he was in bed with his wife or working at the time of the assaults, and (4) other individuals could have committed these crimes.

## E. The Jury's Verdict

In June 2008, the jury convicted defendant of the crimes against J.P., S.K., K.H., A.L., and A.M. as alleged by the State. Specifically, the jury convicted defendant of (1) stalking (720 ILCS 5/12-7.3(a)(2) (West 2006)) and attempt (residential burglary) (720 ILCS 5/8-4, 19-3(a) (West 2006)), in case No.

06-CF-581 as to J.P.; and (2) (a) 1 count of intimidation (720 ILCS 5/12-6(a)(1) (West 2006)), (b) 2 counts of residential burglary (720 ILCS 5/19-3(a) (West 2006)), (c) 2 counts of aggravated unlawful restraint (720 ILCS 5/10-3.1(a) (West 2006)), (d) 3 counts of home invasion (720 ILCS 5/12-11(a)(1), (a)(3) (West 2006)), and (e) 25 counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1), (a)(8) (West 2006)) in case No. 06-CF-679 as to S.K., K.H., A.L., and A.M.

### F. Defendant's Sentence

Following defendant's August 2008 sentencing hearing, the trial court merged several of defendant's convictions in case No. 06-CF-679 pursuant to the one-act, one-crime rule. After doing so, the court entered judgment against defendant on (1) 1 count of (a) stalking (720 ILCS 5/12-7.3(a)(2) (West 2006)) and (b) attempt (residential burglary) (720 ILCS 5/8-4, 19-3(a) (West 2006)) in case No. 06-CF-581; and (2) (a) 1 count of intimidation (720 ILCS 5/12-6(a)(1) (West 2006)), (b) 2 counts of home invasion (720 ILCS 5/12-11(a)(1), (a)(3) (West 2006)), and (c) 13 counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1), (a)(8) (West 2006)) in case No. 06-CF-679.

The trial court then imposed a series of consecutive terms of imprisonment, which incorporated a number of enhancements based on defendant's use of a (1) firearm and (2) dangerous weapon other than a firearm. The court explained its incorpora-

- 41 -

tion of those enhancements as follows:

> "[T]he aggravated[-]criminal[-]sexual[-]
> assault charges in [case No.] 06[-]CF[-]679
> contain certain sentence enhancements[,]
> which mandate the imposition of additional
> penalties if a weapon is involved in the
> commission of the offense.  The statute de-
> fining aggravated criminal sexual assault
> directs that a violation of [section 12-
> 14](a)(8) [(720 ILCS 5/12-14(a)(8) (West
> 2006)),] where the accused was armed with a
> firearm, is a Class X felony for which fif-
> teen years shall be added to the term of
> imprisonment imposed by the [c]ourt; and a
> violation of [section 12-14](a)(1) [(720 ILCS
> 5/12-14(a)(1) (West 2006))], where the ac-
> cused was armed with a dangerous weapon other
> than a firearm, *** is a Class X felony for
> which ten years shall be added to the term of
> imprisonment imposed by the [c]ourt.  Like-
> wise, home invasion, as charged in [c]ount 1
> in this case, pursuant to *** [section] 5/12-
> 11(a)(3) [(720 ILCS 5/12-11(a)(3) (West
> 2006))], indicates that where the accused was

- 42 -

armed with a firearm during the commission of the offense, the offense shall be a Class X felony for which fifteen years shall be added to the term of imprisonment imposed by the [c]ourt.

The jury in this case found beyond a reasonable doubt that *** defendant committed the offense of aggravated criminal sexual assault while armed with a firearm in [c]ounts 3 and 4, 6 through 11, and 28 through 29. The jury also found beyond a reasonable doubt that *** defendant committed the offense of aggravated criminal sexual assault while armed with a dangerous weapon other than a firearm, specifically, a knife in [c]ounts 32 and 33. And, finally, the jury found beyond a reasonable doubt that *** defendant committed the offense of home invasion while armed with a firearm on [c]ount 1 ***. The [c]ourt finds that the sentencing enhancements for the use of a firearm and a dangerous weapon, therefore, apply to this case and *** defendant's sentence on [c]ounts 1, 3 and 4, 6 through 11, and 28 through 29 will be in-

- 43 -

creased by a term of fifteen years on each count.  And *** defendant's sentence on [c]ounts 25, 32, and 33 shall be increased by a term of ten years on each count."

The court thereafter sentenced defendant to a series of consecutive prison terms, totaling 440 years.

This appeal followed.

## II. ANALYSIS

Defendant argues that (1) the trial court erred by (a) allowing the State to introduce dozens of exhibits involving, among other things, graphic pornographic images and text, including depictions of rape, (b) denying his motion for change of venue, (c) excluding the testimony of his expert witness, and (d) failing to question jurors regarding the presumption that he was innocent until proven guilty; (2) the State failed to prove him guilty beyond a reasonable doubt that he sexually assaulted A.M.; and (3) his sentencing enhancements for the aggravated criminal sexual assaults against K.H., A.L., and S.K. violate the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, §11).  We address defendant's contentions in turn.

### A. Defendant's Claim That the Trial Court Erred by Allowing the State To Introduce Irrelevant and Prejudicial Pornographic Material

Defendant argues that the trial court erred by allowing

the State to introduce dozens of exhibits involving, among other things, graphic pornographic images and text, including depictions of rape (hereinafter the pornography) because this evidence was irrelevant. Defendant further contends that if this court were to conclude that this evidence was relevant, the trial court still erred by admitting it because it was "more prejudicial than probative and admitted without limitation."

### 1. The Pornography Presented in This Case

At trial, the State presented the following exhibits recovered from defendant's home computers: (1) 23 poster boards, containing images, Internet search results, and gallery names; (2) a slide show depicting Internet searches; and (3) two 30-second movie trailers. We discuss each group of exhibits individually to place them in context.

Initially, we note that the State's computer forensic experts recovered the pornography at issue in this case from defendant's home computers. Those experts recovered, in relevant part, (1) approximately 175 pornographic images, (2) numerous Internet search terms and the results of those searches, and (3) 2 short movie trailers. The content of the images and movie trailers are self-evident. However, the description of the Internet searches and other written content is more nuanced. That is, a number of the State's exhibits showed Internet searches that were guided by search terms entered by the computer's

user into what is known as a "search engine," such as those run by "Google" and "Yahoo!"  The result of those searches revealed a list, or menu, of corresponding Web sites containing those terms from which the user could select.  Some of the exhibits shown to the jury in this case depicted search terms as well as the results of those searches.  The State also presented a number of exhibits depicting the content of Web sites that it claimed defendant had viewed.  Those Web sites included what the parties refer to as "gallery names"--that is, they included links to other Web sites with short descriptions of those sites.  As we will explain, a few of those images, search results, and gallery names were not relevant to the State's case and should not have been admitted.

### a. The Poster Boards

The State showed the jury 23 separate poster boards, which depicted images, gallery names, and search results that it claimed defendant had viewed.  Those poster boards included the following material: (1) 23 images depicting rape, penetration of women with foreign objects, bondage, and forced fellatio (exhibit C1); (2) 22 images depicting rape, penetration of women with foreign objects, domination, bondage, fellatio, incest, and a gynecological exam (exhibit C2); (3) 22 images depicting rape, bondage, fellatio, caning, and penetration of women with foreign objects, including vaginal and anal shock (exhibit C3); (4) 5

images depicting rape and women penetrating themselves (exhibit C4); (5) 9 images depicting rape, bondage, fellatio, and a woman having her throat slashed with a knife (exhibit C5); (6) 10 written Internet search term results for the search term "bdsm rape," which included a result for mother-daughter incest and gay rape (exhibit C6); (7) 10 written Internet search results for the search term "real rape," which included results for father-son-teen incest and gay rape (exhibit C7); (8) a written short story describing a rape, with links at the bottom of that Web site, which described incest (exhibit C8); (9) a Web site that included rape video links and images depicting rape and bondage, including 3 images and stories describing incest (exhibit C11); (10) approximately 40 images depicting rape, bondage, women penetrating themselves, and penetration of women with foreign objects, including vaginal shock from the Web site www.damseldiary.com (exhibit C12); (11) 11 blacked-out images from the Web site www.maxirape.com (exhibit C13); (12) several images depicting forced fellatio and rape at gunpoint from the Web site www.maxirape.com (exhibit C14); (13) several images depicting rape at knifepoint and gunpoint from the Web site www.maxirape.c-om (exhibit C15); (14) images depicting rape at gunpoint from the Web site www.maxirape.com (exhibit C16); (15) several images depicting rape at knifepoint and gunpoint from the Web site www.maxirape.com (exhibit C17); (16) a written list of 118

gallery names, such as "Girl tied up at the wall," "Lesbian slave in bondage," and "Brutal electric pussy treatment," from the Web site www.Bdsmsexaffraid.com (exhibit C18); (17) 26 images and 120 gallery names, such as "Girl fucked by brutal device" and "Lesbian torture," from the Web site www.Bdsmsexaffraid.com (exhibit C19); (18) 6 images depicting rape at gunpoint from the Web site www.forcedfuckers.com (exhibit C20); (19) 28 images depicting domination and forced fellatio, as well as Internet links to 4 videos with short stories describing (a) brides being raped on their wedding night, (b) men overpowering women, (c) men in uniform raping women, and (d) lesbian rape, from the Web site www.forcedfuckers.com (exhibit C21); (20) numerous written gallery names (in very small font) from the Web site www.sodomcity.com, describing links to fetishes such as "Secretaries Drinking Cum and Piss" (exhibit C22); (21) written gallery names (in very small font), such as "High Powered Machines Taking Pussy A Part," and images, including a woman being caned, from the Web site www.sodomcity.com (exhibit C23); (22) numerous blacked-out images from a "Free Rape Page" taken from the Web site www.screamncream.com (exhibit C24); and (23) 51 images depicting rape, bondage, and forced fellatio from the Web site www.screamncream.com (exhibit C25).

### b. The Slide Show

The State also presented to the jury a slide show,

which included the following data recovered from defendant's home computers: (1) an Internet search termed "Real Rape" with results linking to 5 different Web sites, including a father-son incest site (exhibit 9a); (2) an "adults only" warning page (exhibit 9b); (3) a "Rape Gallery" result page (exhibit 9c); (4) results for sex machine and brutal rape videos (exhibit 9d); (5) results and links for father-son incest, straight and homosexual rape, and men with animals (exhibit 9e); (6) results and links to rape and sexual violence Web sites (exhibit 9f); (7) an Internet search termed "bondage" with results linking to bondage and various fetish Web sites (exhibit 9g); (8) a credit-card-decline page (exhibit 9h); (9) an Internet search based on the search term "BONDAGE" with four results linking to bondage Web sites (exhibit 9i); (10) a page showing only a search termed "porn illegal" (exhibit 9j); (11) text describing fantasy rape, bondage, sexual slavery, and forced submission (exhibit 9k); and (12) a three-line story about the rape and bondage of fitness trainers (exhibit 9l).

### c. The Movie Trailers

The State also showed the jury two short Internet video trailers, which were approximately 30 seconds long. The first depicted a woman strapped to a board, who was wearing a leather mask, being penetrated by another person's fist. (That person was otherwise out of view.) The second depicted two women in

their underwear who were bound at their hands and feet being thrown onto a bed.

## 2. The Relevancy of the Pornography

Evidence is relevant when it (1) renders a matter of consequence more or less probable or (2) tends to prove a fact in controversy. People v. Lynn, 388 Ill. App. 3d 272, 280, 904 N.E.2d 987, 994 (2009). The issue of whether evidence is relevant and admissible is reserved to the sound discretion of the trial court. Lynn, 388 Ill. App. 3d at 280, 904 N.E.2d at 994. The exercise of the trial court's discretion in that regard will not be reversed absent an abuse of that discretion. Lynn, 388 Ill. App. 3d at 280, 904 N.E.2d at 994. A trial court abuses its discretion only when its decision is arbitrary, unreasonable, or fanciful or where no reasonable person would take the trial court's view. People v. Bean, 389 Ill. App. 3d 579, 590, 906 N.E.2d 738, 747 (2009) (adding that "[a]side from no review at all, the abuse-of-discretion standard is the most deferential standard of review").

As previously explained, the pornography at issue depicted primarily violence against women, bondage, sadism, and rape. We earlier described this material at length, and we will not repeat that description now. Instead, it suffices to note that, as the court observed, a significant portion of this material involved the use (or forced use) of fingers or foreign

objects to penetrate women both vaginally and anally, as well as many instances of female masturbation and other fetish-based dramatizations.  The court explained that after carefully considering all of the material the State offered, as well as the arguments of counsel, it found that the evidence was relevant because of the particular circumstances of the crimes involving the victims in this case.  In particular, the court ruled that the pornographic "sites and photographs and images that have to do with forced sex, rape, bondage, the use of foreign objects, and observations of female masturbation are relevant."  We also note that the court ruled that some of the pornography would not be admitted--namely, that which dealt with the "forced witness" concept, as well as videos that ended with a shower scene.  The court found that it did not see those matters as relevant to the State's charges.

We conclude that the trial court correctly determined that the vast majority of the pornography was relevant in this case, given that it (1) involved forced sex, rape, bondage, the use of foreign objects on women, and female masturbation and (2) was recovered from defendant's home computer.  In other words, the court found that most of the pornography tended to prove a fact in controversy--namely, who committed the crimes charged--because the pornography, which was found in defendant's computer, involved acts and scenarios that were emulated by the perpetrator

in these cases.

In concluding that the trial court correctly determined that most of the pornography was relevant, we note that the perpetrator of these sexual assaults not only emulated behavior shown in this pornography, but in fact told some of the victims that he liked it when they penetrated themselves digitally or with foreign objects, like dildos or vibrators, and that their doing so "got him off."  He also told another victim that he liked female masturbation where "the female would insert some-thing into her vagina to manipulate herself."  The seemingly peculiar emphasis on this form of sexual activity in the porno-graphic materials at issue--that is, vaginal and anal penetration of women digitally or by foreign objects, as well as their masturbation--suggests a link to the perpetrator of these of-fenses, who also seemed to have a peculiar interest in this sexual activity.  Such a link could properly be considered by the court in its evaluation that the evidence was relevant.

Notwithstanding our conclusion that the vast majority of the pornographic evidence was relevant, our review of the exhibits in this case reveals that some of it, such as some of the gallery names and search results described above (see, for example, "Secretaries Drinking Cum and Piss" (exhibit C22)--which we reiterate were written in exceptionally small font) and the images depicting incest, caning, and a gynecological exam were

irrelevant to the State's theory of the case and should not have been admitted.  Thus, we conclude that the trial court erred by admitting these irrelevant portions of the State's exhibits.  However, given the overwhelming proof of defendant's guilt in this case, we view the court's error in this regard to be harmless.

Although the erroneous admission of other-crimes evidence carries a high risk of prejudice, the evidence must be so prejudicial that the defendant is denied a fair trial.  People v. Lopez, 371 Ill. App. 3d 920, 937, 864 N.E.2d 726, 741 (2007); see People v. Cortes, 181 Ill. 2d 249, 285, 692 N.E.2d 1129, 1145 (1998) (noting that such an error "must have been a material factor in [the defendant's] conviction such that without the evidence the verdict likely would have been different").  In short, "[i]f the error is unlikely to have influenced the jury, admission will not warrant reversal."  Cortes, 181 Ill. 2d at 285, 692 N.E.2d at 1145.  An evidentiary issue is harmless when no reasonable probability exists that the jury would have acquitted the defendant absent the error.  See In re E.H., 224 Ill. 2d 172, 180, 863 N.E.2d 231, 235 (2006) (explaining that the harmless-error-review standard for evidentiary issues is the "reasonable probability" standard, whereas the harmless-error-review standard for constitutional issues is the "beyond a reasonable doubt" standard).

Having carefully scrutinized the exhibits in this case, we conclude that the irrelevant pornographic evidence admitted was not a material factor in defendant's conviction and that no reasonable probability exists that the jury would have acquitted defendant absent the error. Indeed, we conclude that the court's evidentiary error would have been harmless even under the more restrictive "beyond a reasonable doubt" standard. Here, (1) the number of images presented depicting, among other things, incest, vaginal shock, and caning were not extensive when compared to the much larger number of relevant images presented; (2) the prejudicial impact of the irrelevant gallery names was greatly diminished, given that (a) the font on the vast majority of those names was very small--indeed, some were barely legible--and (b) the great majority of those gallery names were listed as part of the full Web site presented to show that defendant was viewing material related to rape; and (3) the prejudicial impact of the irrelevant search results was substantially diminished by the fact that (a) the primary purpose of showing those exhibits was to prove that defendant was using certain search terms--which we note were relevant--such as "bondage" and "bdsm rape" and (b) the exhibits did not indicate that defendant selected from the "menu" of search results any of those results that we have concluded were irrelevant. Given the lack of prejudice in the context of this case--that is, the number of other relevant pornographic

images, gallery names, and search results--and the overwhelming evidence linking defendant to the crimes for which he was convicted, we conclude that the trial court's admission of certain irrelevant pornographic evidence, while erroneous, was harmless.

In addition to defendant's challenge to the admission of the pornographic material on general relevancy grounds, he further asserts that the State's theory that this evidence was relevant is flawed because the State failed to present any evidence showing that the pornography was being viewed contemporaneously with the time the sexual assaults were committed. For instance, defendant asserts that the record shows that the pornographic Web sites were visited on or after August 16, 2005, over six months after the last rape. However, as did the trial court, we reject the idea that the State was somehow required to demonstrate that the pornography was viewed contemporaneously with the sexual assaults in this case. Instead, such claimed discrepancies in the dates of the viewing of the pornographic material on defendant's home computer and the dates of the offenses in this case constitute merely one of many factors for the trial court to consider in the totality of the circumstances as it determined whether the pornography was relevant.

### 3. Defendant's Claim That the Pornographic Evidence, Even if Relevant, Was More Prejudicial Than Probative

Defendant next contends that because the pornography at issue, even if relevant, was more prejudicial than probative, the

trial court erred by permitting the State to introduce it into evidence.  We disagree.

We first note that defendant misstates the applicable rule of law.  The question is not whether relevant evidence is more prejudicial than probative; instead, relevant evidence is inadmissible only if the prejudicial effect of admitting that evidence <u>substantially</u> <u>outweighs</u> any probative value.  <u>People v. Hanson</u>, No. 106566, slip op. at 20 (June 24, 2010), ___ Ill. 2d ___, ___, ___ N.E.2d ___, ___ ("A court may exercise its discretion and exclude evidence, even if it is relevant, if the danger of unfair prejudice substantially outweighs any probative value"-);  <u>People v. Walker</u>, 211 Ill. 2d 317, 337, 812 N.E.2d 339, 350 (2004);  <u>People v. Bryant</u>, 391 Ill. App. 3d 228, 244, 907 N.E.2d 862, 876 (2009). "Prejudicial effect" in this context of admitting that evidence means that the evidence in question will somehow cast a negative light upon a defendant for reasons that have nothing to do with the case on trial.  <u>Lynn</u>, 388 Ill. App. 3d at 278, 904 N.E.2d at 992.  In other words, the jury would be deciding the case on an improper basis, such as sympathy, hatred, contempt, or horror.  <u>People v. Lewis</u>, 165 Ill. 2d 305, 329, 651 N.E.2d 72, 83 (1995),

Here, the State presented a significant number of pornographic images, sexually explicit Web sites, and gallery names.  Those images, Web site, and gallery names depicted or

described (1) sexual brutality; (2) rape, including the rape of women on their wedding night; (3) bondage; (4) forced fellatio at gunpoint and knifepoint; (5) the use of vibrators and dildos; (6) oral sex; (7) anal sex; and (8) various other sexually explicit fetishes. The victims in this case testified that they were subjected to one or more of the following similar acts: (1) having (a) a rope or cord tied around their neck and (b) dildos and vibrators used on them and (2) being (a) bound with zip ties, (b) forced to perform oral sex at gunpoint and knifepoint, (c) raped a short time before marriage, (d) subjected to oral sex by their attacker, (e) ordered to "pleasure" themselves with as many fingers as they could fit into their vaginas, and (f) forced to choose between being violated anally or vaginally.

In Hanson, slip op. at 20, ___ Ill. 2d at ___, ___ N.E.2d at ___, the supreme court explained that the question of whether the danger of unfair prejudice substantially outweighed the probative value of the evidence in question was a matter within the trial court's discretion, and unless that court's decision was arbitrary, fanciful, or unreasonable, the court would not abuse its discretion if it deemed the evidence admissible. Having reviewed the record in this case, we conclude, as did the trial court, that the probative value of the pornographic images and sexually explicit Web sites and gallery names was very high. The State was entitled to use that evidence to show that

defendant was the intruder described in the victims' testimony. The pornographic material presented established a backdrop of peculiar sexual interests by defendant. That is, the material painted a picture for the jury of defendant as a person who "got off on" the peculiar sexual activity emphasized in the pornography, just as the perpetrator of these crimes told some victims that he similarly "got off on" those same activities in which he forced the victims to engage. Consistent with the supreme court's statement of the standard of review in Hanson, we conclude that the trial court's decision was far from being arbitrary, fanciful, or unreasonable and did not constitute an abuse of its discretion.

## B. Defendant's Claim That The Trial Court Erred by Not Giving the Jury a Limiting Instruction Regarding Its Consideration of the Pornography

Defendant next argues that even if this court were to conclude that the pornographic material was properly admitted, the trial court committed reversible error by not giving the jury a limiting instruction regarding that evidence. Defendant concedes that he did not request such an instruction at trial, but he asserts alternatively that the trial court's failure to give a limiting instruction either (1) constituted plain error or (2) resulted from the ineffective assistance of his trial counsel. We reject defendant's first contention and decline to address his second.

In addressing defendant's contentions, we first note that the possession or viewing of the pornography at issue in this case does not technically constitute criminal conduct. That is, assuming defendant was the person who possessed the pornography on his home computer and viewed it, his doing so did not constitute a criminal act. Nonetheless, as this court explained in People v. Spyres, 359 Ill. App. 3d 1108, 1112, 835 N.E.2d 974, 977 (2005), "[t]he term 'other-crimes evidence' encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial." (Emphasis added.) On this same point, see the supreme court's analysis in People v. Illgen, 145 Ill. 2d 353, 365, 583 N.E.2d 515, 519-20 (1991); see also People v. Johnson, 368 Ill. App. 3d 1146, 1154, 859 N.E.2d 290, 298 (2006). Persons serving as jurors in defendant's case might view his possession and viewing of the pornography in this case as "misconduct." Accordingly, we will address defendant's contention regarding the need for a limiting instruction in this context.

### 1. Defendant's Plain-Error Contention

A trial court's failure sua sponte to give an instruction that is normally required triggers a plain-error analysis to bypass normal forfeiture principles only "when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the

evidence."  People v. Herron, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467, 479 (2005).  The record in this case reveals that neither of these circumstances is present here.

First, we reiterate that when the totality of the evidence against defendant is considered, the State's evidence of his guilt to be overwhelming.  Because the evidence is not close, defendant has failed to meet the first prong of the plain-error test.

Second, the alleged error is not as serious as defendant contends.  That is, although we earlier noted that the pornography evidence at issue in this case does technically constitute "other-crimes evidence," as this court has earlier broadly described that term, it is nonetheless a form of that evidence which is both less often seen and less prejudicial generally than the other form of "other-crimes evidence," which is in fact evidence of other crimes.  The reason for this distinction is simple: the primary danger associated with the admission of other-crimes evidence is that the jury will view it as establishing a defendant's propensity to commit crime.  See People v. Heard, 187 Ill. 2d 36, 58, 718 N.E.2d 58, 71 (1999).  The form of other-crimes evidence at issue in this case, which may cast the defendant in a bad light, will almost never be as potentially damaging to a defendant on trial as would be his actual criminal conduct because the primary fear associated with

"other-crimes evidence"--namely, that it will be viewed as propensity evidence--is not present.

We agree with defendant that on this record, the trial court should at least have raised sua sponte the question of whether the jury should be given a limiting instruction regarding its consideration of the pornography evidence. For instance, the court could have informed defendant that if he wished such an instruction be given, the court was prepared to give one. Nonetheless, because the evidence at issue did not constitute evidence of actual criminal conduct by defendant, which would raise the concerns about propensity evidence we earlier discussed, we reject defendant's contention that the absence of an instruction here constituted plain error.

In so concluding, we also note that the supreme court has described this second prong of plain-error analysis as involving a clear and obvious error so serious that it affected the fairness of a defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. People v. Piatkowski, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). Further, "[t]he burden of persuasion remains with the defendant under both prongs of the plain-error test." People v. Lewis, 234 Ill. 2d 32, 43, 912 N.E.2d 1220, 1227 (2009). Judged in accordance with these standards, defendant's plain-error argument falls far short.

## 2. Defendant's Ineffective-Assistance-of-Counsel Claim

Defendant alternatively asserts that his trial counsel's failure to request a limiting instruction constitutes ineffective assistance of counsel.  Although we are skeptical of this claim, we nonetheless decline to reach the merits of defendant's assertion because this claim is better pursued under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 through 122-8 (West 2008)).

Claims of ineffective assistance of counsel are judged pursuant to the standards established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).  The Strickland standard requires a defendant to demonstrate that (1) defense counsel's performance was so deficient such that "counsel was not functioning as the 'counsel' guaranteed the defendant by the [s]ixth [a]mendment" and (2) but for defense counsel's deficient performance, the result of the proceeding would have been different. Strickland, 466 U.S. at 687, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068.  "Both prongs of the Strickland test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel." People v. Calvert, 326 Ill. App. 3d 414, 421, 760 N.E.2d 1024, 1030 (2001).  To prove that counsel's performance was deficient, a defendant must overcome the strong presumption that the challenged action or inaction was the

product of sound trial strategy.  Strickland, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.

In People v. Kunze, 193 Ill. App. 3d 708, 726, 550 N.E.2d 284, 296 (1990), this court held that claims of ineffective assistance of counsel are often better made in proceedings on a petition for postconviction relief, where a complete record can be made.  In Kunze, the defendant's claims of ineffective assistance turned on whether defendant would have testified in his own defense had he known that the State could use his prior convictions to impeach him.  Kunze, 193 Ill. App. 3d at 725, 550 N.E.2d at 296.  This court declined to reach the merits of the defendant's claims of ineffectiveness because nothing in the record permitted such a determination to be made.  Kunze, 193 Ill. App. 3d at 725-26, 550 N.E.2d at 296.

Here, as in Kunze, the record before us contains nothing to review regarding defendant's counsel's trial strategy related to an instruction limiting the other-crimes evidence. Without a record, we are unwilling to deem counsel's failure to submit a limiting instruction ineffective for purposes of Strickland, given that it appears that an argument can be made that defense counsel's inaction fell within the bounds of reasonable trial strategy--namely, that counsel did not want to further "dirty up" his client in the eyes of the jury by drawing additional attention to such evidence.  This is especially true

considering that in most other respects, counsel acted diligently and professionally in this case.  Because the answer to whether counsel's decision was one of trial strategy is currently de hors the record, we decline to consider it and instead will await defendant's pursuit of such a claim under the Act (725 ILCS 5/122-1 through 122-8 (West 2008)).

### C. Defendant's Claim That the Trial Court Erred by Not Giving a Limiting Instruction to Evidence That He Was a Peeping Tom and a Stalker

Defendant further contends that the trial court erred by failing to give a limiting instruction to the jury regarding the evidence the State presented that (as defendant describes it) he was "a pervert who spent his nights roaming the streets of Bloomington peering in windows and stalking women."  We first note that, as we discussed earlier, defendant failed to ask for such a limiting instruction at trial.  Thus, defendant is again asking us to view this contention as either (1) plain error or (2) ineffective assistance of counsel.  For the same reasons discussed in the previous section of this opinion, we reject defendant's plain-error contention and decline to address his ineffective-assistance-of-counsel claim.

Nonetheless, we note that defendant's characterization of the State's evidence is hyperbole.  The testimony in question demonstrated instead that defendant engaged in odd or suspicious behavior, but it was not criminal conduct and was not even

behavior that would necessarily cast defendant in a bad light. For these reasons, defendant's argument here is not even as strong as the one we previously rejected.

### D. Defendant's Claim That the Trial Court Erred by Denying His Motion for Change of Venue

Defendant next contends that the trial court erred by denying his motion for change of venue.  Specifically, defendant asserts that because a number of the potential jurors--including two jurors who were eventually empaneled--had formed opinions about the case due to the extensive media coverage concerning this case, he did not receive a fair trial.  We disagree.

In <u>People v. Little</u>, 335 Ill. App. 3d 1046, 1052, 782 N.E.2d 957, 963 (2003), this court discussed when a defendant is entitled to a change of venue, as follows:

> "A defendant is entitled to a change of venue
> as a result of pretrial publicity if a rea-
> sonable apprehension exists that [he] cannot
> receive a fair and impartial trial.  <u>People
> v. Fort</u>, 248 Ill. App. 3d 301, 309, 618 N.E.-
> 2d 445, 452 (1993).  'Exposure to publicity
> about a case is not enough to demonstrate
> prejudice because jurors need not be totally
> ignorant of the facts and issues involved in
> a case.'  <u>People v. Kirchner</u>, 194 Ill. 2d
> 502, 529, 743 N.E.2d 94, 108 (2000).  In-

stead, what is essential is that the jurors ultimately chosen must be able to lay aside impressions or opinions and render a verdict based upon the evidence at trial. People v. Sutherland, 155 Ill. 2d 1, 16, 610 N.E.2d 1, 7 (1992). Thus, the relevant inquiry on appeal is not how much pretrial publicity occurred, but whether the defendant received a fair and impartial trial. People v. Lucas, 132 Ill. 2d 399, 422, 548 N.E.2d 1003, 1011 (1989)."

"In evaluating a defendant's claim that his jury was prejudiced due to pretrial publicity, a reviewing court must review the entire record, including voir dire testimony, to determine independently whether the defendant was denied a fair trial." Kirchner, 194 Ill. 2d at 529, 743 N.E.2d at 108. Thus, the court's focus is not on the mood of the general public but, instead, it must be on the mood of the actual jury empaneled.

In this case, although a number of the jurors eventually empaneled had heard about the case, only two jurors, Larson and Willenborg, claimed to have formed an opinion about the case. During voir dire, the trial court inquired about these jurors' ability to set aside their respective opinions and render a verdict based upon the evidence at trial. The court first

addressed Larson, as follows:

"THE COURT: Okay, [a]ll right.  Based on the information that you have heard in the past through the news media and so forth, have you formed any opinions about this case or about *** [d]efendant's guilt as you sit here today?

MR. LARSON: Well, it's, the way they gloss up a case, it's hard to say that he's innocent.

THE COURT: Okay.  So you have heard things and *** you may have formed some opinions based upon what you have previously heard?

MR. LARSON: Correct.

THE COURT: Okay.  All right.  If you were to be selected as a juror in this case, the [c]ourt would instruct you that you are to decide the case only on the basis of the evidence that you hear in the courtroom and the instructions of law that are presented to the jury at the end of the case; that is, you are to disregard anything that you may have heard or read about the case outside of the

evidence presented here in the courtroom. If you were selected as a juror in this case, do you believe that you could disregard what you may have heard or read about the case and decide the case only on the evidence presented in court and the law that you will be given by the [c]ourt? Do you believe that you could do that?

MR. LARSON: It would be difficult but I think I can.

THE COURT: All right. Now, when you say it would be difficult but you think you can do that, [is the court] to understand that what you are saying is you have some opinions, but you believe you could set those aside, listen to *** all the evidence, and then decide the case based on the evidence that you hear? You believe you could do that?

MR. LARSON: That's correct."

The court then turned its attention to Willenborg, as follows:

"THE COURT: Okay. As you sit hear today, do you have an opinion as to whether *** [d]efendant is guilty in this case?

MS. WILLENBORG: Yes.

THE COURT: If you were selected to serve as a juror in this case, do you believe that you could disregard what you may have heard or read or talked about with others and set aside that opinion and decide this case only on the evidence which will be presented in open court and the law that the [c]ourt will give you?  Do you think you could do that?

MS. WILLENBORG: Yes.

THE COURT: In other words, do you think you could be fair and impartial to both sides without regard to the opinion you may have formed:

MS. WILLENBORG: Yes."

As this exchange demonstrates, each of the panelists in this case convinced the trial court that he or she could be fair and impartial--that is, each agreed that he or she could determine whether defendant was guilty based only upon the evidence presented at trial.  Accordingly, we conclude that the court did not err by denying defendant's motion for a change of venue.  In so concluding, we note that the court's analysis of this issue was entirely correct, particularly its observation that the actual <u>voir</u> <u>dire</u> examination of potential jurors is the best

- 69 -

method for determining whether pretrial publicity has resulted in prejudice against a defendant so as to warrant granting his motion for a change of venue.

In support of our conclusion, we find support in the recent decision of the United States Supreme Court in Skilling v. United States, 561 U.S. ___, 177 L. Ed. 2d 619, 130 S. Ct. 2896 (2010), wherein the Court rejected the defendant's argument that he was deprived of his constitutional right to a fair trial when the trial court denied his motion to move his trial (which involved charges of fraud arising from the Enron collapse) to a different venue. In rejecting the defendant's claim, the Court wrote that "our decisions *** 'cannot be made to stand for the proposition that juror exposure to ... news accounts of the crime ... alone presumptively deprives the defendant of due process.'" Skilling, 561 U.S. at ___, 177 L. Ed. 2d at 643, 130 S. Ct. at 2914, quoting Murphy v. Florida, 421 U.S. 794, 799, 44 L. Ed. 2d 589, 594, 95 S. Ct. 2031, 2036 (1975). The Court further reiterated that "[j]urors are not required to be 'totally ignorant of the facts and issues involved'; 'scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.'" Skilling, 561 U.S. at ___, 177 L. Ed. 2d at 643, 130 S. Ct. at 2915, quoting Irwin v. Dowd, 366 U.S. 717, 722, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1642 (1961). The Court also explained the preeminent role of the

trial court regarding this question, writing as follows:

> "Jury selection, we have repeatedly empha-
> sized, is 'particularly within the province
> of the trial judge.'  [Citations.]
>
> When pretrial publicity is at issue,
> 'primary reliance on the judgment of the
> trial court makes [especially] good sense'
> because the judge 'sits in the locale where
> the publicity is said to have had its effect'
> and may base her evaluation on her 'own per-
> ception of the depth and extent of news sto-
> ries that might influence a juror.'  [Cita-
> tion.]  Appellate courts making after-the-
> fact assessments of the media's impact on
> jurors should be mindful that their judgments
> lack the on-the-spot comprehension of the
> situation possessed by trial judges.
>
> Reviewing courts are properly resistant
> to second-guessing the trial judge's estima-
> tion of a juror's impartiality, for that
> judge's appraisal is ordinarily influenced by
> a host of factors impossible to capture fully
> in the record--among them, the prospective
> juror's inflection, sincerity, demeanor,

candor, body language, and apprehension of duty. [Citation.] In contrast to the cold transcript received by the appellate court, the in-the-moment _voir_ _dire_ affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service." _Skilling_, 561 U.S. at ___, 177 L. Ed. 2d at 646, 130 S. Ct. at 2917-18.

### E. Defendant's Claim That the Trial Court Erred by Excluding Fulero's Expert Testimony

Defendant next contends that the trial court erred by granting the State's motion _in_ _limine_ to exclude Fulero's expert testimony. Specifically, defendant asserts that the court improperly reasoned that defendant had not provided sufficient proof (1) of what Fulero's testimony would be and (2) that Fulero's testimony would not invade the province of the jury. We disagree.

"'A trial judge has discretion in granting a motion _in_ _limine_ and a reviewing court will not reverse a trial court's order allowing or excluding evidence unless that discretion was clearly abused.'" _Gallina v. Watson_, 354 Ill. App. 3d 515, 518, 821 N.E.2d 326, 329 (2004), quoting _Swick v. Liautaud_, 169 Ill. 2d 504, 521, 662 N.E.2d 1238, 1246 (1996). Failure on the part of a defendant to make a proper offer of proof forfeits review of his challenge to the trial court's granting of a motion _in_

- 72 -

limine.  People v. Roberson, 401 Ill. App. 3d 758, 768, 927
N.E.2d 1277, 1287 (2010).

When a defendant claims that he has not been given the
opportunity to prove his case because the trial court improperly
barred evidence, he "must provide [the] reviewing court with an
adequate offer of proof as to what the excluded evidence would
have been."  In re Estate of Romanowski, 329 Ill. App. 3d 769,
773, 771 N.E.2d 966, 970 (2002).  Such an offer of proof serves
dual purposes: (1) it discloses to the court and opposing counsel
the nature of the offered evidence, thus enabling the court to
take appropriate action, and (2) it provides the reviewing court
with an adequate record to determine whether the trial court's
action was erroneous.  People v. Thompkins, 181 Ill. 2d 1, 10,
690 N.E.2d 984, 989 (1998).

The traditional way of making an offer of proof is the
"formal" offer, wherein counsel offers the proposed evidence or
testimony by placing a witness on the stand, outside the jury's
presence, and asking him questions to elicit with particularity
what the witness would testify to if permitted to do so.  People
v. Wallace, 331 Ill. App. 3d 822, 831, 772 N.E.2d 785, 794
(2002).

In lieu of a formal offer of proof, counsel may request
permission from the trial court to make representations regarding
the proffered testimony.  As a matter of the court's discretion,

the court may allow such an "informal" offer of proof.

A trial court may deem an informal offer of proof sufficient if counsel informs the court, with particularity, (1) what the expert testimony will be, (2) by whom it will be presented, and (3) its purpose. Kim v. Mercedes-Benz, U.S.A., Inc., 353 Ill. App. 3d 444, 451, 818 N.E.2d 713, 719 (2004). However, an informal offer of proof is inadequate if counsel (1) "merely summarizes the witness' testimony in a conclusory manner" (Snelson v. Kamm, 204 Ill. 2d 1, 23, 787 N.E.2d 796, 808 (2003)) or (2) offers unsupported speculation as to what the witness would say (People v. Andrews, 146 Ill. 2d 413, 421, 588 N.E.2d 1126, 1132 (1992)).

In any event, it remains entirely within the trial court's discretion whether to accept an informal offer of proof in lieu of the formal offer consisting of testimony from the witness stand. Although it would be helpful for the court to address this issue explicitly--that is, to inform counsel on the record whether the court is satisfied with counsel's informal offer of proof--if the court fails to do so sua sponte, the obligation to obtain such a ruling remains with counsel. Especially given how easy it is for counsel to obtain such a ruling from the court, we are disinclined to engage in speculation about whether the court was willing to accept an informal offer of proof if the record is not explicit on that point. Thus, absent

such an explicit record, it was incumbent upon defendant's counsel to make a formal offer of proof to the court to preserve for appeal the court's ruling that the testimony in question was not admissible.

Here, the record is clear that the trial court explicitly rejected any informal offer of proof.  The court made clear its position regarding the offer of proof as to Fulero's testimony, as follows:

"[F]rankly[, the court is] very frustrated at that.  [The court is] at a loss in how to *** rule on this motion without [knowing what] the evidence *** is going to be.

So[, the court's] ruling on the State's [m]otion *** [is] this; the motion is allowed unless and until the court is presented with certain evidence that this eyewitness expert has real probative evidence that does not invade the province of the jury in determining credibility of witnesses."

A few days later, defendant filed a motion to reconsider, in which counsel again attempted to make an informal offer of proof.  In response, the trial court entered its findings as follows:

"Today in [defendant's] motion to recon-

sider, *** defendant has filed and attached to the motion to reconsider exhibit A[,] which is *** titled ['A] brief outline of testimony['] and is purported to be an out-line of the testimony to be presented by *** Ful[e]ro.  The court certainly understands the concern raised by [defense counsel] here and [the court is] not *** suggesting any kind of fraud here[, b]ut this is simply a document, a typed page that is not attribut-able in terms of authorship to anyone[.]  It is not an official report of *** Fulero, and it is simply an outline of those subjects *** that he would apparently testify about in terms of the general theory of memory and what affects memory and various stages of the memory process in human beings, specifi-cally[,] eyewitnesses.

It does not indicate that the *** pro-posed witness has reviewed any evidence in this case.  It does not purport to provide any opinions of *** Fulero regarding his opinions regarding the eyewitness identifica-tions in this case such that they are and it

certainly does not in any way provide the court with any additional information as to how his testimony relates to the facts of this case.

* * *

[W]e are not any further today [(April the 21st)] then we were on April the 7th. [The court has] some understanding of what the eyewitness would testify to in general ***.  [However], none of that has been related to any of the specific facts in this case.  The witness has not tendered any expert opinion as to the facts in this case ***[.  At] this point[, the court has] no idea what this expert witness would testify to that would be relevant to the facts in this particular case.

[F]or that reason[,] the motion to reconsider is denied."

Because defendant failed to make an adequate offer of proof--that is, a formal offer of proof (as required by the trial court) of Fulero's testimony from the witness stand--we have no way of knowing whether the excluded testimony would have (1) been admissible or (2) assisted the jury in its determination of

- 77 -

guilt.  Thus, defendant's failure to make an adequate offer of proof deprives this court of the record required to determine whether the court abused its discretion by granting the State's motion in limine to exclude Fulero's expert testimony.

### F. Defendant's Claim That the Trial Court Erred by Failing To Question the Jurors Regarding the Presumption of Innocence

Defendant next contends that the trial court erred by failing to sua sponte question the jurors regarding the presumption of innocence.  In particular, defendant asserts that the court failed to comply with Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007), which requires, in pertinent part, that "[t]he court shall ask each potential juror, individually or in a group, whether that juror understands and accepts *** that the defendant is presumed innocent of the charge(s) against him."  Defendant posits that the court's failure to specifically ask each juror whether he or she understood that he was presumed innocent warrants a new trial.  We disagree.

### 1. Forfeiture and Plain Error

As a preliminary matter, we note that defendant concedes that he has forfeited review of this issue.  Nonetheless, defendant maintains the issue may be addressed by this court because it constitutes plain error.

Under the plain-error doctrine, a reviewing court may consider an otherwise forfeited error when (1) the evidence is so

closely balanced that the jury's guilty verdict may have resulted from the error or (2) the error is so serious that the defendant was denied a fair trial. People v. McLaurin, 235 Ill. 2d 478, 489, 922 N.E.2d 344, 351 (2009). However, before we decide in this instance whether plain-error review is appropriate, we will first determine whether the trial court erred at all.

### 2. Zehr and Rule 431(b)

In People v. Zehr, 103 Ill. 2d 472, 477-78, 469 N.E.2d 1062, 1064 (1984), the supreme court held that a trial court errs when, during voir dire, it fails to ensure that jurors understand that (1) the defendant is presumed innocent, (2) the State must prove defendant guilty beyond a reasonable doubt, (3) the defendant need not present any evidence on his own behalf, and (4) the defendant's decision not to testify cannot be held against him.

In 2007, the supreme court amended Rule 431(b) to require trial courts to sua sponte ask each potential juror whether they understand and accept the Zehr principles. People v. Graham, 393 Ill. App. 3d 268, 273, 913 N.E.2d 99, 103 (2009). Specifically, Rule 431(b) states, in pertinent part, as follows:

> "The court shall ask each potential
> juror, individually or in a group, whether
> that juror understands and accepts the [Zehr]
> principles ***.
>
> The court's method of inquiry shall

provide each juror an opportunity to respond to specific questions concerning the principles set out in this section."  Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007.

### 3. This Court's Rule 431(b) Precedent

In People v. Owens, 394 Ill. App. 3d 147, 914 N.E.2d 1280 (2009), and People v. Yusef, 399 Ill. App. 3d 817, 822, 928 N.E.2d 143, 148 (2010), this court concluded that despite reciting the Zehr principles to the venire en masse, the trial court erred because it failed to directly ask the jurors--pursuant to the second paragraph of Rule 431(b)--whether they understood those principles.  Similarly, in Roberson, 401 Ill. App. 3d at 766, 927 N.E.2d at 1285, this court held that the trial court erred by failing to ask the jurors--pursuant to the first paragraph of Rule 431(b)--all the Zehr questions.  Having reviewed the record in this case, we conclude that Owens, Yusef, and Roberson are distinguishable and that our holding in People v. Willhite, 399 Ill. App. 3d 1191, 1197, 927 N.E.2d 1265, 1270 (2010), guides our analysis in this case.

In Willhite, the trial court recited the Zehr principles to the jurors at the start of voir dire but also questioned the jurors regarding their understanding and acceptance of the Zehr principles after dividing them into smaller panels.  Willhi-

te, 399 Ill. App. 3d at 1195-96, 927 N.E.2d at 1269. From those smaller panels, the jurors collectively acknowledged that they understood and accepted the Zehr principles. Willhite, 399 Ill. App. 3d at 1196, 927 N.E.2d at 1269. This court held that in doing so, "the trial court committed no error." Willhite, 399 Ill. App. 3d at 1197, 927 N.E.2d at 1270.

4. The Trial Court's Zehr Questioning in This Case

Prior to trial, the trial court explained the Zehr principles to the 40-person pool of potential jurors, as follows:

"Ladies and gentlemen, in this case, [defendant], as with any other person who is charged with a crime, is presumed innocent of the charges that bring him before you. This presumption is with him now at the onset of this trial, and it will remain with him throughout the course of the proceedings ***. [This] is not overcome unless and until each of you individually and collectively are convinced beyond a reasonable doubt that *** [d]efendant is guilty. It is absolutely essential as we select this jury that each of you understands and employs these certain fundamental principles; that is, that all persons charged with a crime are presumed to

be innocent.  And it is the burden of the

State *** to prove *** [d]efendant guilty

beyond a reasonable doubt.  What this means

is that *** [d]efendant has no obligation to

testify in his own behalf or to call any

witnesses in his defense.  ***

The fact that *** [d]efendant chooses

not to testify must not be considered by you

in any way in arriving at your verdict.  ***

The bottom line, however, is that there

is no burden upon *** [d]efendant to prove

his innocence.  It is the State's burden to

prove him guilty beyond a reasonable doubt."

The court then divided the potential jurors into smaller panels--

mostly of four--for questioning.  As part of its questioning, the

court asked each group, in pertinent part, the following ques-

tions, to which the jurors collectively responded:

"[THE COURT: W]hen [the court] was ad-

dressing the entire group, [it] touched on

some general principles of the law that apply

to all criminal cases.  Now, one of those was

the presumption of innocence.  Do each of you

understand and accept that this means that

*** [d]efendant does not need to prove his

innocence?

Seeing all positive responses.

* * *

[THE COURT:] Do each of you understand
that he does not need to testify, and that if
he chooses not to testify, that you must not
consider that in any way in arriving at a
verdict?  Each of you understand that?

Seeing all positive responses."

Here, as in <u>Willhite</u>, the trial court recited the <u>Zehr</u>
principles to the jurors at the start of <u>voir</u> <u>dire</u> but also
questioned the jurors regarding their understanding and accep-
tance of the <u>Zehr</u> principles after dividing them into smaller
panels.  From the smaller panels, the jurors collectively ac-
knowledged that they understood and accepted those <u>Zehr</u> princi-
ples, and in particular, that defendant was presumed innocent of
the charges against him.  Therefore, we conclude, as we did in
<u>Willhite</u>, that the trial court complied with Rule 431(b).
Accordingly, we need not decide whether the court committed plain
error in this case.

## G. Defendant's Claim That the State's Evidence Was Insufficient To Prove Him Guilty of Sexually Assaulting A.M.

Defendant next contends that the State failed to prove
him guilty beyond a reasonable doubt of sexually assaulting A.M.
Specifically, defendant contends that because (1) A.M. could not

- 83 -

identify her attacker, (2) the State failed to produce deoxyribo-nucleic acid (DNA) linking him to the attack, (3) he was working during the time of her attack, (4) "material differences" existed between her attack and those committed against the other victims, and (5) other potential perpetrators were not sufficiently pursued, the State failed to prove beyond a reasonable doubt that he committed the aggravated criminal sexual assault of A.M. Defendant misconstrues the focus of our sufficiency-of-the-evidence review. The question is not, "What did the State fail to show?" but, instead, "Was the evidence the State presented sufficient to prove that defendant perpetrated the crimes charged?" We answer this latter question in the affirmative.

"We review a defendant's challenge to the sufficiency of the evidence to determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." People v. Grimes, 386 Ill. App. 3d 448, 455, 898 N.E.2d 768, 774-75 (2008). "This same standard of review applies regardless of whether the evidence is direct or circumstantial." People v. Cooper, 194 Ill. 2d 419, 431, 743 N.E.2d 32, 40 (2000). The jury's findings are entitled to great weight, given that it is in the best position to judge the credibility and demeanor of the witnesses. People v. Wheeler, 226 Ill. 2d 92, 114-15, 871 N.E.2d 728, 740 (2007). Moreover,

the jury need not conclude beyond a reasonable doubt as to each link in the chain of circumstances.  <u>People v. Slater</u>, 393 Ill. App. 3d 977, 982, 924 N.E.2d 1039, 1044 (2009).  Instead, the jury need only be satisfied that all the evidence, taken together, shows that the defendant committed the crime charged beyond a reasonable doubt.  <u>Slater</u>, 393 Ill. App. 3d at 982, 924 N.E.2d at 1044.  In reaching its verdict, the jury is not required to (1) disregard inferences that flow normally from the evidence presented or (2) search out all possible explanations consistent with innocence and raise them to the level of reasonable doubt.  <u>Slater</u>, 393 Ill. App. 3d at 982, 924 N.E.2d at 1044.

An accused commits aggravated criminal sexual assault, in pertinent part, when he commits an act of sexual penetration by the use of force or threat of force, while displaying, threatening to use, or using a dangerous weapon other than a firearm. 720 ILCS 5/12-14(a)(1) (West 2006).

Here, the State presented the following evidence that defendant committed aggravated criminal sexual assault against A.M.: (1) defendant logged off duty at 3:44 a.m.; (2) the sexual assault took place at approximately 4:30 a.m.; (3) A.M.'s attacker wore a black ski mask, jeans, and a black coat, which were similar to the items worn by the perpetrator of the other sexual assaults charged in this case and linked to defendant; (4) A.M.'s attacker (a) shined a flashlight on her, (b) put twine around her

neck, (c) threatened her at knifepoint, (d) ordered her to take off all her clothes, (e) told her that he had been watching her, (f) inquired about her roommate, (g) performed oral sex on her, and (h) put his fingers in her vagina, as in the other sexual assaults charged in this case and linked to defendant; and (5) defendant accessed--for no apparent legitimate law enforcement reason--(a) A.M.'s and her roommate's personal information through LEADS by running their license plate numbers and (b) A.M.'s parent's personal information through the NCIC database the month before the sexual assault on A.M.

This evidence, and our reading of the record as a whole, compels the conclusion that the same perpetrator committed all the crimes in this case--that is, as we used the term earlier, they were signature crimes, committed by the same assailant. The jury could consider--as do we--the strength of the State's case linking defendant to each of those signature crimes individually. Accordingly, we conclude that the State presented far more than merely sufficient evidence to prove defendant guilty beyond a reasonable doubt in connection with the aggravated criminal sexual assault of A.M.

### H. Defendant's Claim That His Sentence Enhancements for Using a Weapon Against K.H., A.L., and S.K. Violate the Proportionate-Penalties Clause of the Illinois Constitution

Defendant next contends that his sentencing enhancements for aggravated criminal sexual assault while armed with a

knife or firearm (counts related to K.H., A.L., and S.K.) (720
ILCS 5/12-14(a)(1), (a)(8) (West 2006)) violate the
proportionate-penalties clause of the Illinois Constitution (Ill.
Const. 1970, art. I, §11) when compared to the offense of armed
violence with a category I or category II weapon predicated upon
criminal sexual assault (720 ILCS 5/33A-2(a) (West 2006)).
Specifically, defendant asserts that the two offenses are "com-
prised of substantially identical elements" but have different
sentences.  We agree with defendant insofar as a firearm is
concerned.

The supreme court has established two alternative ways
in which a defendant may challenge a statute based on
proportionate-penalties grounds.  See People v. Sharpe, 216 Ill.
2d 481, 517-18, 839 N.E.2d 492, 514-15 (2005).  A defendant may
argue that a penalty (1) violates the "cruel or degrading"
standard or (2) is harsher than the penalty for an offense with
identical elements.  People v. McCarty, 223 Ill. 2d 109, 137, 858
N.E.2d 15, 33 (2006).

"Courts have a duty to construe a statute in a manner
that upholds its validity and constitutionality if it reasonably
can be done."  People v. Baker, 341 Ill. App. 3d 1083, 1087, 794
N.E.2d 353, 357 (2003).  Because such challenges attack the
constitutionality of statutes--which is an issue of law--our
review is de novo.  People v. Klepper, 234 Ill. 2d 337, 348, 917

N.E.2d 381, 386 (2009).

This court recently rejected the argument defendant posits related to enhancements based upon the use of a knife, as follows:

"The elements of aggravated criminal sexual assault are achieved when an accused (1) commits a criminal sexual assault (2) while displaying, threatening to use, or using (3) a dangerous weapon other than a firearm--such as, a knife.  720 ILCS 5/12-14(a)(1) (West 2006).  The elements of armed violence with a category II weapon predicated upon criminal sexual assault are achieved when an accused (1) commits criminal sexual assault (2) while armed with (3) a category II weapon--such as a knife.  720 ILCS 5/33A-1(c)(2), 33A-2(a) (West 2006).

The plain language of these statutes reveals that their elements are not identical.  That is, an accused could commit aggravated criminal sexual assault by committing sexual assault, while threatening to use-- although not actually armed with--a knife. Such an act would not substantiate a charge

of armed violence with a category II weapon predicated upon criminal sexual assault because the accused would not have been armed." (Emphasis in original.) People v. Henderson, 394 Ill. App. 3d 747, 754-55, 915 N.E.2d 473, 479 (2009).

We continue to adhere to our holding in Henderson as to the sentencing enhancements related to the knife (the category II weapon). However, after reviewing the statutory provisions, we conclude that the aggravated criminal sexual assault predicated upon the accused having been armed with a firearm--that is, when an accused (1) commits a criminal sexual assault (2) while armed with a firearm (720 ILCS 5/12-14(a)(8) (West 2006))--when compared to armed violence with a category I weapon predicated upon criminal sexual assault--that is, when an accused (1) commits criminal sexual assault (2) while armed with (3) a category I weapon--such as firearm (720 ILCS 5/33A-1(c)(2), 33A-2(a) (West 2006))--violates the proportionate-penalties clause. In other words, aggravated criminal sexual assault predicated upon the accused having been armed with a firearm (720 ILCS 5/12-14(a)(8) (West 2006)) and armed violence with a category I weapon predicated upon criminal sexual assault (720 ILCS 5/33A-1(c)(2), 33A-2(a) (West 2006)) have identical elements.

Accordingly, we vacate the 15-year enhancements--that

is, those enhancements based on the use of a firearm--for defendant's aggravated-criminal-sexual-assault conviction and remand with directions that the trial court issue an amended written judgment to so reflect.  See Baker, 341 Ill. App. 3d at 1090, 794 N.E.2d at 359 (vacating the defendant's 15-year enhancement for aggravated-kidnaping conviction and remanding with directions that the trial court amend its written judgment).

In closing, we note that some of the crimes that were enhanced based upon the use of a firearm appear to have been eligible for enhancement based upon defendant's use of a knife as well.  For the reasons we have explained, enhancements in this context based upon the use of a knife do not run afoul of the proportionate-penalties clause and, if appropriate, may be used by the trial court on remand to enhance defendant's sentence.

### III. CONCLUSION

For the reasons stated, we affirm in part, vacate in part, and remand with directions.  As part of our judgment, we award the State it $75 statutory fee against defendant as costs of this appeal.

Affirmed in part and vacated in part; cause remanded with directions.

TURNER and APPLETON, JJ., concur.