960 N.E.2d 11 (2011)
355 Ill. Dec. 568
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Elwyn Vaughan THOMAS, Defendant-Appellant.
No. 4-10-0666.
Appellate Court of Illinois, Fourth District.
August 10, 2011.
Rehearing Denied October 5, 2011.
*12 Michael J. Pelletier, State Appellate Def., Karen Munoz, Deputy Defender, Michael H. Vonnahmen, Asst. Appellate Defender, Office of State Appellate Defender, for Elwyn Vaughan Thomas.
Michael L. Stroh, Woodford County State's Attorney, Patrick Delfino, Director, Robert J. Biderman, Dep. Director, Anastacia R. Brooks, Staff Atty., State's Attorneys Appellate Prosecutor, for People.

OPINION
Presiding Justice KNECHT delivered the judgment of the court, with opinion.
¶ 1 Defendant, Elwyn V. Thomas, appeals his May 2009 conviction by jury for criminal sexual assault (720 ILCS 5/12-13(a)(4) (West 2006)). In July 2009, the trial court sentenced defendant to five years in prison. Defendant argues the trial court erroneously took judicial notice of and read to the jury the following facts: he failed to appear for his final pretrial hearing in November 2006, a warrant was issued for his arrest, and he was arrested in California in January 2009 trying to enter the country from Mexico and extradited to Illinois. We affirm.

¶ 2 I. BACKGROUND
¶ 3 In August 2006, defendant was charged with the August 13, 2006, aggravated criminal sexual abuse of J.P., his stepdaughter, by digital penetration of her vagina, a Class 2 felony (720 ILCS 5/12-16(d) (West 2006)). In November 2006, defendant failed to appear for the final pretrial hearing, and the trial court issued a warrant for his arrest.
¶ 4 In January 2009, the United States Department of Justice arrested defendant as he attempted to enter California from Mexico. He was extradited to Woodford County in April 2009. In May 2009, the State indicted defendant on additional charges: two charges of criminal sexual assault, Class 1 felonies (720 ILCS 5/12-13(a)(4), (a)(3) (West 2006)), based on the same August 13, 2006, digital penetration of J.P.
¶ 5 That same month, a jury trial was held. J.P., born June 21, 1992, testified she believed defendant was 31 years old in August 2006. Defendant, who was from Wales, was her stepfather. J.P.'s mother married defendant when J.P. was 11. J.P.'s mother was dying of lung cancer and taking medication on the date of the charged events. J.P.'s mother died on August 23, 2006, 10 days after the crimes allegedly occurred.
*13 ¶ 6 J.P. testified, on the evening of August 12, 2006, she was at home playing on the computer. Defendant's friend, Aaron McCarty, was at the house in another room. At some point, defendant entered the room where J.P. was on the computer and told her to go to bed or "socialize." J.P. turned off the computer and went into the "bar room" where defendant and McCarty were playing pool and drinking. At some point, J.P.'s brother arrived. Defendant had J.P. try some different kinds of alcohol. She believed she drank Bacardi Silver as well as two types of Mad Dog 20/20. J.P. did not like the drinks.
¶ 7 Around midnight, they stopped playing pool and began playing a card game, 21. The person whose cards were closest to 21 would take a double shot of Mad Dog. J.P. believed she won seven times; her brother won twice. They played the game less than an hour.
¶ 8 After playing the game, J.P. attempted to play pool with McCarty and defendant. She could not stand without help. She began feeling fuzzy and could not speak properly. At that time, J.P. was around 4 feet 10 inches or 4 feet 11 inches tall and weighed less than 100 pounds. McCarty tried to hold her up while she played pool.
¶ 9 J.P. testified at some point in the night her clothing was wet. There was a swimming pool at her house, but she did not remember getting into it. She went upstairs and changed into her pajamas. After changing into her pajamas, she went downstairs. She believed she fell because she was on the floor between the barroom and her mother's room. Defendant brought her a pillow, and McCarty began rubbing her back, under her shirt. At some point, McCarty undid J.P.'s bra and continued rubbing her back. This lasted approximately five minutes. J.P. did not see defendant during this time.
¶ 10 Defendant asked J.P. if she liked the back rub. J.P. did not respond. McCarty and defendant walked out of the room. J.P. stood up and felt dizzy. She walked out the front door onto the porch, where McCarty and defendant were. Defendant stood on the porch; McCarty was standing two steps down. J.P. stood between them. McCarty then put his hand up J.P.'s shirt and under her bra. Defendant then put his hand down the back of J.P.'s pants and her underwear and put his fingers inside J.P.'s vagina. While touching J.P., defendant and McCarty continued talking.
¶ 11 After the men stopped, J.P. went to her room, but she did not remember walking there. She laid in her bed with the light on and facing the wall. She was not feeling well. She felt confused. At some point, defendant entered her room. J.P. vomited. She laid back down and faced the wall. Defendant "got on [her] bed behind" J.P. and started whispering, "[P]lease say yes, [J.P.] [P]lease say yes." Defendant said this to J.P. at least 10 times. Defendant left the room. J.P. then called 9-1-1.
¶ 12 On cross-examination, J.P. testified defendant acted as a parent figure in the house and set and enforced rules. J.P. testified "[h]e used to smack my butt and stuff." J.P. did not have a good relationship with defendant before this event, and she admitted she hated him. On redirect examination, J.P. asserted she was not making up these events because she hated defendant. She believed defendant had taken her mother from her.
¶ 13 McCarty also testified. McCarty, at the time of his testimony, was 28 years old. He was an inmate in the Department of Corrections following his guilty plea to the aggravated criminal sexual abuse of J.P. McCarty had already served over two *14 years of his sentence, and he made no agreement with the State in exchange for his testimony. McCarty also had a 2000 conviction for burglary.
¶ 14 Regarding the events of August 12-13, 2006, McCarty testified before going to defendant's house, he already had consumed a few beers. He also brought a six-pack of Bacardi to defendant's house. Defendant was drinking Mad Dog 20/20. About half an hour after McCarty's arrival, J.P. and her brother entered the room. They began playing blackjack with defendant and McCarty.
¶ 15 Before this time, McCarty and defendant had a conversation regarding J.P. and the fact she had never consumed alcohol. Defendant stated he "thought it was a little weird" she had not yet done so and wanted to see her get drunk at least once. Then, "they" made the card game into a drinking game. McCarty could not recall who initiated this change. Defendant and McCarty made it a goal to get J.P. drunk by fixing the deck. J.P. began drinking more, slurring her words, and losing her balance. Defendant continued drinking as well.
¶ 16 After about an hour to two hours of card playing, J.P., defendant, and McCarty went outside and sat next to the pool. Defendant and McCarty asked J.P. to jump into the pool. J.P. refused because her swimsuit was in the laundry. Defendant told J.P. her bra and underwear were the same as a swimsuit, and he tried to unbutton her pants. J.P. pulled away. J.P.'s speech at this time was slurred. J.P. grabbed McCarty's glasses and threw them into the pool. McCarty told her to jump in and retrieve them. J.P., in her clothes, did so. Defendant did as well; both looked for McCarty's glasses. After J.P. and defendant exited the pool, McCarty began wringing the water out of J.P.'s pants from the knee down. He saw defendant attempting to unbutton J.P.'s pants. J.P. pulled away and went inside. McCarty and defendant followed her inside.
¶ 17 McCarty testified both defendant and J.P. changed clothes. Defendant and McCarty began playing pool and started drinking again. J.P. returned after changing into her pajamas and laid on the floor next to the pool table. McCarty began rubbing J.P.'s back under her clothes. McCarty unhooked J.P.'s bra and continued rubbing her back for approximately half an hour. Defendant continued playing pool but was watching. He "kind of [gave McCarty] a thumbs up." When McCarty stopped, J.P. left the room.
¶ 18 McCarty decided it was time to leave. He walked outside to get some fresh air. Defendant followed him. J.P. later came out. J.P. put her arms around McCarty. McCarty put his hands up her shirt. McCarty's hand was touching J.P.'s breast under her bra. Defendant was behind J.P. McCarty laid his head on J.P.'s shoulder. Defendant moved next to J.P. McCarty saw defendant's hand move into J.P.'s "rear area, her butt type area." At this point, McCarty pulled away. McCarty could not see defendant's hand, but he could see defendant's arm moving back and forth. McCarty testified his contact with J.P. lasted approximately 30 seconds. McCarty testified at this point J.P.'s mother stepped through the door and asked if they heard any noises. Both said they had not. J.P. and her mother went inside.
¶ 19 Defendant and McCarty stayed on the front porch for a short time. Defendant told McCarty he "needed to get laid." McCarty told defendant to leave J.P. alone. Defendant responded, "I know. I know not to." McCarty then left. The following morning Nicholas Cavera, chief of police with the Minonk police department, went to McCarty's house. Because the events were "eating at [his] conscience," *15 McCarty told Cavera what happened.
¶ 20 On cross-examination, McCarty admitted telling Cavera it was his decision to stack the deck. McCarty did not remember playing pool on his arrival.
¶ 21 Chief Cavera, chief of police with the Minonk police department, testified that at approximately 3 a.m. on August 13, 2006, he was dispatched to a residence in response to allegations a 14-year-old girl had been sexually assaulted by her stepfather and his friend. Upon Cavera's arrival at the residence, he rang the doorbell, and defendant opened the door. Defendant exited the residence to speak with Cavera about the allegations. Defendant was cooperative. Cavera did not notice any signs of intoxication.
¶ 22 Defendant went with Cavera to the police station. Defendant denied J.P.'s allegations. Defendant told Cavera he and his friend had a few beers and played pool with his stepson. Defendant stated he told J.P. to go to bed, but she did not. Defendant said he, his friend, J.P., and his stepson played blackjack for drinks. Defendant allowed J.P. to drink and stated J.P. had approximately four drinks.
¶ 23 Cavera testified defendant reported when McCarty was getting ready to leave, McCarty walked to the front porch. He and defendant talked there for approximately 10 minutes. Then, J.P., in her pajamas, came out "and mumbled something as if she was intoxicated or still intoxicated." According to defendant, J.P. put her arms around McCarty and McCarty held his arms in the air so he would not touch her. Defendant told J.P. to go back into the house, and McCarty left. During Cavera's second interview with defendant, defendant stated he was only guilty of letting J.P. drink.
¶ 24 During a break in Cavera's testimony, the State asked the trial court to take judicial notice of facts from which a jury could infer defendant fled prosecution and present those facts to the jury. Defendant objected on grounds such evidence was more prejudicial than probative, the court's presentation of the facts would appear to the jury as if the court was testifying against him, and the use of the facts would create a fifth-amendment issue. The court denied defendant's objection and read the following to the jury at the close of Cavera's testimony on direct:
"Ladies and gentlemen, the courtthis court has taken judicial notice of the following facts. After posting bond on this charge, the defendant failed to appear for a final pretrial on November 8th of 2006. A warrant was issued for his arrest. He was arrested in the State of California on January 11, 2009, and was extradited back to this court's jurisdiction on April 1st of 2009."
¶ 25 In closing arguments, defense counsel argued the following:
"Now, I'm sure you're going to hear more from the State about why [defendant's] leaving is enough that you should just convict. But [defendant] had the sameas the State said, [J.P.'s] memory. [Defendant] had the same problems at the same time. He had this case going on, which I'm sure scared the daylights out of him. It wouldhe is from a different country and may or may not be familiar with this system. He has a wife who is dying, died of cancer. And there is [sic] a lot of reasons to leave, not just, `I am guilty so I am running.'"
¶ 26 The jury found defendant guilty of all three charges. In July 2009, the trial court sentenced defendant to concurrent prison terms of three years for aggravated criminal sexual abuse and five years for *16 each criminal-sexual-assault conviction. On a motion for reduction of sentence, the trial court vacated defendant's convictions for criminal sexual abuse and one count of criminal sexual assault (count III).
¶ 27 This appeal followed.

¶ 28 II. ANALYSIS
¶ 29 On appeal, defendant argues the trial court erred when it took judicial notice and informed the jury of the facts he failed to appear for his final pretrial hearing in November 2006 and, upon an arrest warrant, was arrested in California in January 2009 and extradited to Illinois. Defendant maintains the missed court date was of little probative value, because "[a]s this Court knows, it is hardly an unusual situation that a criminal defendant does not appear in court for a pretrial hearing." Defendant argues unfair prejudice results because the jury was not made aware it was not unusual for defendants to miss such hearings. Also, defendant contends the fact he was apprehended over two years after his court date was "very prejudicial" and had "very low" probative value as to whether defendant committed the crime.
¶ 30 The question in this appeal "is not whether relevant evidence is more prejudicial than probative; instead, relevant evidence is inadmissible only if the prejudicial effect * * * substantially outweighs any probative value." (Emphasis in original.) People v. Pelo, 404 Ill.App.3d 839, 867, 347 Ill.Dec. 260, 942 N.E.2d 463, 487 (2010). In this context, "prejudicial effect" means the evidence "will somehow cast a negative light upon a defendant for reasons that have nothing to do with the case on trial." Pelo, 404 Ill.App.3d at 867, 347 Ill.Dec. 260, 942 N.E.2d at 487.
¶ 31 The trial court, after considering defendant's argument, admitted the evidence. Defendant argues we should consider this issue de novo, but we will reverse the court on this ground only if we find an abuse of discretion. See People v. Williams, 181 Ill.2d 297, 314, 229 Ill.Dec. 898, 692 N.E.2d 1109, 1119 (1998) (holding the function of the trial court is to weigh the probative value of evidence versus its prejudicial effect and the reviewing court will not disturb a court's decision on such matter absent an abuse of such discretion that prejudices the defendant).
¶ 32 We find the trial court did not abuse its discretion. The facts are probative as to defendant's guilt. See People v. Lewis, 165 Ill.2d 305, 349, 209 Ill.Dec. 144, 651 N.E.2d 72, 93 (1995) ("The fact of flight, when considered in connection with all other evidence in a case, is a circumstance which may be considered by the jury as tending to prove guilt."). Defendant knew as of August 13, 2006, he was being investigated on allegations of a sex offense. Later that month, defendant was charged with aggravated criminal sexual abuse. In November 2006, defendant missed the final pretrial conference. He did not return to Illinois or to the court on his own volition. Instead, he was arrested while entering California from Mexico over two years after he missed the court date and a warrant was issued for his arrest. This evidence does not "cast a negative light upon * * * defendant for reasons that have nothing to do with the case on trial." Pelo, 404 Ill.App.3d at 867, 347 Ill.Dec. 260, 942 N.E.2d at 487.
¶ 33 Defendant contends he was prejudiced because the jury was not informed "it is hardly an unusual situation" for defendants to miss pretrial conferences. This argument fails. First, defendant isolates one fact, he did not appear for the final pretrial conference, in making his argument. The jury was not, however, informed of this fact in isolation. It was combined with other facts that do give rise *17 to an inference of flight. Given the inference from all of the facts, we find no prejudice results in the jury not being informed "it is hardly an unusual situation" defendants miss pretrial conferences. The jury also heard argument that other circumstances, not consciousness of guilt, may have triggered defendant's departure from the country.
¶ 34 Defendant next contends the trial court's procedure in taking judicial notice of this evidence "was very improper and error." Defendant maintains the facts that he missed his court date and was eventually arrested in California are neither matters of common knowledge that everyone knows are true nor matters readily verifiable from sources of indisputable accuracy. In addition, defendant suggests the taking of judicial notice was improper because his arrest was not part of the court's own records.
¶ 35 Defendant cites only one case supporting this argument: People v. Jackson, 182 Ill.2d 30, 230 Ill.Dec. 901, 695 N.E.2d 391 (1998). The lone statement the Jackson court makes on the issue of judicial notice is the following: "a court will take judicial notice of its own records." Jackson, 182 Ill.2d at 66, 230 Ill.Dec. 901, 695 N.E.2d at 409. Jackson does not hold a court cannot take judicial notice of other governmental or public records, and it certainly does not even suggest or hint the trial court here improperly took judicial notice of these facts.
¶ 36 Jackson provides no support, and defendant has cited no authority supporting his argument on appeal, in violation of Illinois Supreme Court Rule 341(h)(7) (Ill. S.Ct. R. 341(h)(7) (eff. July 1, 2008)). Defendant has forfeited our review of this argument. See People v. Manoharan, 394 Ill.App.3d 762, 772, 334 Ill.Dec. 101, 916 N.E.2d 134, 143 (2009).
¶ 37 In his reply brief, defendant contends a document from the United States Custom Service, that shows his arrest in California, does not show it is a public record. The document was stamped, "This document is loaned to you for your official use only and remains the property of the United States Custom's Service." The fact the document is owned by the United States Customs Service, according to defendant, shows the document was not a public record and should not have been judicially noticed.
¶ 38 Defendant makes this argument without any authority of any kind. Whether the United States Customs Service owns the document may not even be relevant to whether the document is available to the public. Defendant must make his argument and support it with authority. This court is not a depository in which the burden of research and argument can be dumped. People v. Hood, 210 Ill.App.3d 743, 746, 155 Ill.Dec. 228, 569 N.E.2d 228, 230 (1991) ("A reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository into which the appealing party may dump the burden of argument and research."). We will not research this and make the argument for defendant.
¶ 39 Defendant last argues he was unable to cross-examine the judge or confront witnesses against him regarding this evidence. Citing People v. McDonald, 46 Ill.2d 92, 263 N.E.2d 75 (1970), defendant argues his right to due process was thus violated.
¶ 40 Defendant's lone case on this issue is distinguishable and unhelpful. In McDonald, the error was not in taking judicial notice alone, but in taking judicial notice based on an incorrect memory of the testimony. The trial court in McDonald improperly took judicial notice of lighting conditions at 5:45 a.m. to 6 a.m., *18 when the testimony clearly established the applicable time was between 4:45 a.m. and 5 a.m. See McDonald, 46 Ill.2d at 94-95, 263 N.E.2d at 76-77. Here, no facts indicate the court was mistaken. The court was not relying upon memory but upon documents furnished by a sister jurisdiction.
¶ 41 By relying on a case that does not support his argument, defendant asks this court to develop his argument and make it for him. We decline. See Manoharan, 394 Ill.App.3d at 772, 334 Ill.Dec. 101, 916 N.E.2d at 143 (holding Rule 341(h)(7) requires "points be made with citation to the appropriate legal authority in the argument section of the party's brief").

¶ 42 III. CONCLUSION
¶ 43 For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment as costs of this appeal.
¶ 44 Affirmed.
Justices STEIGMANN and POPE concurred in the judgment and opinion.