2021 IL App (1st) 180065-U

FIRST DISTRICT,
FIRST DIVISION
March 8, 2021

No. 1-18-0065

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 14 CR 11557 |
| | ) | |
| DARIUS KIMBROUGH, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justices Hyman and Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Evidence was sufficient to convict defendant of predatory criminal sexual assault and grooming. (2) The trial court did not abuse its discretion in allowing State to introduce evidence of pornography found on defendant's phone. (3) Prosecutor's statement in closing argument that five-year-old victim was "quiet" and "shy" was fair comment on the evidence. (4) Defendant's 15-year sentence for predatory criminal sexual assault was not excessive.

¶ 2    Defendant Darius Kimbrough was convicted of predatory criminal sexual assault and grooming of five-year-old M.G. On appeal, he argues that (1) the evidence was insufficient to convict him; (2) the trial court erred in allowing the jury to view screenshots of searches for

pornography and stills of pornographic videos recovered from his cell phone; (3) the State made improper closing remarks; and (4) his 17-year sentence was excessive. For the reasons that follow, we affirm.

¶ 3                                        BACKGROUND

¶ 4        Darius spent the night of June 6, 2014, at the apartment of his brother James. James shared the apartment with his son (13-year-old J.K.), his girlfriend Gabriel, and Gabriel's two daughters, 11-year-old D.G. and 5-year-old M.G. On June 7, M.G. told first J.K. and then her mother that Darius had shown her a video on his phone and then put his penis in her mouth. Darius surrendered to police on June 8, and the State charged him with predatory criminal sexual assault and grooming.

¶ 5        M.G., who was nine years old at the time of trial, was unable to identify Darius in court. She testified that in the months leading up to the incident, Darius came to visit a few times a week. He was sometimes mean to Gabriel, calling her names and making fun of her in front of James and his other brothers, Roy and Larnell. Gabriel denied this, testifying that she got along with Darius prior to the incident.

¶ 6        On the evening of June 6, 2014, Darius and Roy spent the night at James' one-bedroom apartment. James and Gabriel slept in the bedroom, while M.G., J.K., and Roy slept in the living room. As for Darius, M.G. testified that he slept "by the dogs," while J.K. recalled that he slept in the living room with them. M.G.'s sister was away at a friend's house.

¶ 7        M.G. testified that early in the morning on June 7, she woke up because Darius' alarm went off. Darius told M.G. to wake up, grabbed her wrist, and brought her to the kitchen. There, he showed her a video on his cell phone of "a man putting his penis in a girl's mouth." Darius told her "to do what the girl did in the video." They went together to the bathroom, where Darius

unzipped his pants and put his penis in M.G.'s mouth. M.G. bit down hard. Darius removed his penis, told her not to bite, and put it back in her mouth.

¶ 8        The incident ended when J.K. entered the bathroom. Darius zipped up his pants, pulled down his shirt, and ran out of the house. Outside on the porch, M.G. told J.K. "a little bit" of what happened.

¶ 9        On cross-examination, M.G. testified that after she was woken up by Darius' alarm, she got up to use the bathroom, which was on the other side of the kitchen.  Darius was sitting at the kitchen table, watching something on his cell phone. M.G. walked up behind Darius, stood next to him, and saw what was on his phone screen. When Darius noticed her, he put his phone down on the table. "[J]ust five seconds or so" later, M.G. told J.K. that she saw a video of a woman sucking "something." She did not specify what the "something" was because she did not know.

¶ 10        On additional cross-examination, M.G. reiterated her testimony that she was in the bathroom with Darius, "something" was in her mouth, and she bit down on it hard.

¶ 11        J.K. testified that he woke up in the middle of the night and saw Darius wake M.G. and bring her to the kitchen. There, Darius held his cell phone horizontally in his hand while M.G. stood next to him. After watching them for a few minutes, J.K. got up and walked through the kitchen to the porch where the dogs were. As he walked by Darius, he noticed Darius quickly pulling down his shirt.

¶ 12        J.K. stayed out on the porch for around six minutes, and then M.G. came out to talk to him. J.K. asked her what happened. M.G. told him that Darius showed her a video of a woman doing "something" to a man, though she did not specify what. M.G. also said that in the bathroom, Darius made her suck "something long and big and fat." Darius told her, "Don't bite it," and he also said, "Don't tell nobody; keep it a secret." J.K. stated that M.G. never used the

term "private parts," explaining that her mother did not allow her to use those words. J.K. further testified that, after the incident, Darius remained at the apartment until "around when Gabriel and [M.G.] were *** coming back."

¶ 13     On cross-examination, J.K. acknowledged that at a prior hearing on May 18, 2016, he testified that during their meeting on the porch, M.G. told him nothing about any part of Darius touching any part of her.

¶ 14     Gabriel testified that later in the morning of June 7, she took M.G. shopping. M.G. did not say anything about Darius during their shopping trip. That afternoon, after the two of them had returned home, J.K. relayed to Gabriel what M.G. said to him. Gabriel then spoke to M.G. Initially, J.K. was present, but M.G. appeared nervous and was reluctant to speak, so Gabriel asked J.K. to leave. Gabriel explained that M.G. "shuts down when she thinks she's in trouble or when she's nervous and people [are] around."

¶ 15     After J.K. left, Gabriel reassured M.G. that whatever she said, she was not in trouble. M.G. then told Gabriel that Darius woke her up, brought her to the kitchen, and showed her a video on his cell phone. After that, the two of them went to the bathroom. M.G. demonstrated to Gabriel that they were standing a couple feet apart with the bathroom door open. M.G. then said that Darius "put his private parts in her mouth." Gabriel asked, "Did you scream or yell or bite it or something like that? I would have bit it or screamed or something." M.G. replied, "I did." Gabriel said, "You did what?" and M.G. said, "Bite it." She told Gabriel that she bit it "three times or something like that." Darius told her not to bite it. Darius also told her, "You're not going to say anything, are you? I'mma give you some candy."

¶ 16     That evening, there was a family meeting with James, Darius, Larnell, J.K., and Gabriel. At the meeting, M.G. was asked "who had done what they shouldn't have done." M.G. testified

that she initially answered "B.J.," but pointed at Darius after Gabriel whispered in her ear.[1] After the family meeting, Larnell and James "beat Darius up."

¶ 17    The next day, June 8, Gabriel brought M.G. and J.K. to the Children's Advocacy Center to speak with Lauren Glazer, a forensic interviewer.[2] A video of M.G.'s interview was shown to the jury. In the interview, M.G. acknowledged that "something" happened to her, but she did not provide any details, and she said she did not remember what she told J.K. When asked about Darius, she described him as "Dad's brother" and a "nice guy." Glazer asked if Darius did something to her that he should not have done. After a long silence, M.G. made an ambiguous head movement which Glazer interpreted as agreement, but M.G. would not speak further on the subject. Detective Jose Castaneda, who watched the interview through a one-way window, testified that M.G. "seemed reluctant *** to talk about the incident."

¶ 18    After the interview ended, M.G. went to a CAC playroom where she colored a picture for her sister. She then brought the picture to Gabriel. On the back of the picture, there was a note which read: "a grl nam [M.G.] Dad had a bruthr he wus nostey too the grl He put hes privet en hr moth" [*sic*]. At trial, M.G. initially testified that she did not recognize the picture, but she then stated that she was the one who colored it.

¶ 19    Gabriel testified that she forwarded the picture to CAC staff. The next day, she brought M.G. back to the CAC for a second interview with Glazer. In that interview, which was also shown to the jury, Glazer showed M.G. the note written on the picture. M.G. said that she wrote it and it was about what Darius did to her. The incident occurred when she went to use the

---

[1] Gabriel testified that she never whispered in M.G.'s ear during the meeting.
[2] Glazer no longer worked at the CAC at the time of trial and did not testify.

bathroom. Darius entered the bathroom after her and put his "private" in her mouth. Then J.K. also entered the bathroom, and Darius "got scared" and put his private back in his pants.

¶ 20     M.G. also told Glazer during the second interview that, prior to the bathroom incident, Darius showed her a video on his phone in which a white woman was sucking the "private" of "a boy." J.K. was outside when this was happening.

¶ 21     Detective James Browne conducted a forensic analysis of Darius' cell phone. As part of Browne's testimony, the State displayed several screenshots of Darius' web history on XVideos, a porn site. As shown in the screenshots, his history included a search for "deepthroating" and visits to pages titled "blowjob videos of the day," "After Work Head," and "BBC Gag Training Pt2 (College Ho)," with BBC standing for "big black cock." The State also showed seven screenshots from porn videos found on Darius' phone, which Browne described to the jury. One of the screenshots depicted a white woman performing oral sex on an adult male. The timestamps on the porn site visits and videos were from the afternoon of June 7, 2014.

¶ 22     Darius was the sole witness in his own defense. He testified that on June 6, 2014, he spent the night at James' apartment. He typically went there two or three times a week. He further testified that he was not on good terms with Gabriel because a few months earlier, he saw her performing oral sex on another man at a party and tried to warn James about it.

¶ 23     That night, Darius slept in the living room with Roy, J.K., and M.G. At around 7 a.m., James came to tell Roy that it was time to get up and go to work. That woke everyone up. Darius, who did not have work that day, went to the kitchen to play an Xbox game. After playing for a while, he picked up his cell phone and started watching a porn video he had previously downloaded. According to Darius, the video showed a black woman and a black man having penis-in-vagina sex; oral sex was not depicted.

¶ 24    Shortly after he started watching the video, Darius heard footsteps behind him. He turned around and saw M.G. standing around four to five feet away. He immediately turned off the video and placed his phone facedown on the table in front of him. He did not deny that M.G. might have seen part of the video, but he stated that he did not invite her to watch it up close. He further stated that he did not take M.G. to the bathroom, he did not tell her to do what she saw in the video, he did not take his penis out, and he did not touch M.G., nor did she touch him. Instead, he went back to playing on the Xbox. Around half an hour later, Gabriel and M.G. left the house. Darius stayed until around 11 a.m., when he left to go to Larnall's house.

¶ 25    At around 11:30 p.m. that night, Darius received a phone call from James, after which he and Larnall went to James' apartment. Also present were James, J.K., Gabriel, and M.G., who was sleeping. Gabriel woke M.G. up and asked, "Who did it to you?" M.G. said, "B.J. did it." Gabriel whispered something in M.G.'s ear while pointing at Darius. M.G. then pointed at Darius.

¶ 26    Larnall and James got in a fight with Darius, giving him a fractured ear and swollen eye. Larnall then told Darius to get out of the house. Darius went to his girlfriend's house, which is where police found and arrested him the following day. Following his arrest, he was interviewed by Detective Castaneda. Darius admitted saying that he watched a porn video about "getting some head," but he denied saying that he showed M.G. the video. In rebuttal, the State played a clip of the interview in which Darius admitted showing M.G. the video. Detective Castaneda confirmed that the clip was true and accurate.

¶ 27    During closing argument, the State argued that in the videotaped interviews with M.G., "[y]ou got to see her demeanor, her behavior. You saw that she was shy, a nervous five-year-old

little girl. Those specific traits are exactly why this defendant targeted five-year-old [M.G.]. She was shy. She was quiet and she was soft-spoken. He thought that she would keep his secret."

¶ 28    The State later reiterated that Darius "targeted" M.G. because "[s]he was quiet, shy and soft spoken and he thought that she would keep that secret that he asked her to, but she didn't." Similarly, in rebuttal argument, the State argued: "He picked her for a reason. He picked her because she's shy and she's quiet and she's reluctant to tell secrets and she's five."

¶ 29    The jury found Darius guilty of one count of predatory criminal sexual assault[3] and one count of grooming. Darius was sentenced to 15 years' imprisonment for predatory criminal sexual assault and 2 years' imprisonment for grooming, to be served consecutively.

¶ 30                                    ANALYSIS

¶ 31    Darius argues that his conviction must be reversed because (1) the evidence was insufficient to convict him; (2) the trial court erred in allowing the State to show irrelevant and prejudicial screenshots of porn-related searches and pornographic material from his cell phone; and (3) the State said during closing argument that Darius targeted M.G. because she was "quiet" and "shy," an assertion with no basis in the record. Darius further argues that his sentence of 15 years for predatory criminal sexual assault is excessive.

¶ 32                            Sufficiency of the Evidence

¶ 33    Darius first argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt, since M.G.'s statements were inconsistent with each other and with J.K.'s testimony, and no physical evidence corroborated her allegations.

---

[3] The State charged Darius with two counts of predatory criminal sexual assault on the theory that he committed two separate assaults when he put his penis in M.G.'s mouth, removed it, and then put it back in. The jury found him not guilty on the second count.

¶ 34    In reviewing the sufficiency of the evidence, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Jackson*, 232 Ill. 2d 246, 280 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The jury bears responsibility for resolving conflicts in testimony, weighing evidence, and drawing reasonable inferences from the evidence, and we will not substitute our judgment on these matters. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). "[C]ognizant that conflicting testimony is to be resolved by the trier of fact" (*People v. Westfield*, 207 Ill. App. 3d 772, 777 (1990)), we do not find that "the record evidence *compels* the conclusion that no reasonable person could accept [M.G.'s testimony] beyond a reasonable doubt." (Emphasis added.) *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 35    Darius argues that M.G.'s testimony on direct examination differed considerably from her testimony on cross-examination, in which she said that she walked up behind Darius and saw him watching a video on his cell phone, and when he noticed her, he put his cell phone down on the table. Notably, this version of events is largely consistent with Darius' own testimony.

¶ 36    Darius also points out that M.G.'s direct testimony is inconsistent with J.K.'s testimony. According to M.G., J.K. entered the bathroom while Darius was making her suck his penis. Upon being caught in the act, Darius immediately ran out of the house. By contrast, according to J.K., he saw M.G. with Darius in the kitchen, apparently watching something on Darius' phone. J.K. then went out on the porch and stayed there until M.G. came out to talk to him. He did not claim to have entered the bathroom or witnessed the assault. He further testified that Darius remained at the house until later that day.

¶ 37 Despite these inconsistencies, we do not find that they render the evidence insufficient for "*any* rational trier of fact" to find Darius guilty beyond a reasonable doubt. (Emphasis in original; internal quotation marks omitted.) *Jackson*, 232 Ill. 2d at 280. M.G.'s testimony on direct examination was consistent with her written statement at the CAC, as well as her description of events in her second interview with Glazer. Even in her cross-examination, she maintained that Darius put "something" in her mouth which she bit. A jury could reasonably conclude that M.G., a young child, might have been confused as to some collateral details of the incident while still able to credibly testify that she was assaulted.

¶ 38 Darius also argues that M.G. is not credible because her mother had a grudge against him and had the opportunity to influence M.G.'s statements. But Gabriel asserted in court that she was on good terms with Darius before the incident, and the jury was entitled to believe that testimony. Gabriel further claimed she did not whisper in M.G.'s ear during the family meeting at which M.G. identified Darius. Moreover, it is well established that "[a] reviewing court will not reverse a conviction simply because *** the defendant claims that a witness was not credible." *Siguenza-Brito*, 235 Ill. 2d at 228. The jury had an opportunity to observe M.G.'s testimony and her videotaped interview with Glazer, at which her mother was not present. They found her testimony credible, and it is not our role to disturb that determination on appeal. *Id.* at 224-25.

¶ 39 Darius next asserts that it is not plausible that he would sexually assault M.G. when so many other people were in the apartment. He overstates the implausibility of this scenario. According to Darius, when he started watching the porn video, Roy had already left to go to work, and James and Gabriel were in their bedroom with the door shut. That left only M.G. and J.K. J.K. testified that he got up and exited the apartment while Darius and M.G. were together in

the kitchen. Thus, Darius and M.G. were alone in the main living area of the apartment. Viewing this evidence in the light most favorable to the State, we do not find an assault so implausible as to create a reasonable doubt as to Darius' guilt.

¶ 40       *People v. Judge*, 221 Ill. App. 3d 753, 761 (1991), which Darius cites on this issue, is distinguishable. In *Judge*, the seven-year-old complainant and her sister were watching cartoons in the living room of their trailer home when defendant (who rented a room in their house) allegedly grabbed her, dragged her across the floor, threw her onto his bed, and sexually assaulted her, "even though her father was in the trailer home at this time." *Id.* The court was concerned that "this alleged activity did not appear to alarm or disturb her younger sister who was awake and with complainant at the time" and that their father was apparently unaware of the assault. *Id.* Additionally, no "noticeable marks or bruises" were found on the complainant's body despite the violent nature of the attack. *Id.* Finally, "the original mention of any abuse was made in response to repeated questioning by [the complainant's] mother," who had made a prior unfounded charge of sexual assault of another child. *Id.* Under these facts, the *Judge* court found that the complainant's testimony did not establish defendant's guilt beyond a reasonable doubt. *Id.*

¶ 41       Here, in contrast to *Judge*, there were no witnesses to the actual assault, which was silent in nature. *Judge* is therefore inapposite.

¶ 42       Darius also argues that M.G.'s testimony was uncorroborated by physical evidence. But as the State points out, the grooming charge was corroborated by forensic examination of Darius' phone, which revealed a video of a white woman performing oral sex on an adult male. As for the alleged assault, because there was no violence or ejaculation involved, it is unsurprising that there would be no physical evidence. More importantly, "it is well settled that a lack of physical

evidence does not establish that a sexual assault did not occur." *People v. Delgado*, 376 Ill. App. 3d 307, 311 (2007) (evidence was sufficient to convict defendant of sexual assault despite inconsistencies in complainant's testimony and lack of corroborating physical evidence); see also *People v. DuPree*, 161 Ill. App. 3d 951, 961 (1987) (physical evidence is not required to prove the commission of a sex crime).

¶ 43    In sum, "[d]efendant's argument regarding the sufficiency of the evidence is ultimately unpersuasive because *** the weaknesses in the evidence that defendant cites on appeal were all presented to, and rejected by, the jury." *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Although we acknowledge inconsistencies in the testimony of the witnesses, "[i]t is not the function of this court to retry the defendant" (*People v. McCarter*, 2011 IL App (1st) 092864, ¶ 21). We find that the evidence was sufficient to sustain Darius' convictions for predatory criminal sexual assault and grooming beyond a reasonable doubt.

¶ 44                    Screenshots from Darius' Phone

¶ 45    Darius next argues that the trial court erred in allowing the State to show screenshots of porn-related searches and screenshots of porn videos from his cell phone, because they were both irrelevant and highly prejudicial.

¶ 46    Evidence is relevant when it (1) renders a matter of consequence more or less probable or (2) tends to prove a fact in controversy. *People v. Lynn*, 388 Ill. App. 3d 272, 280 (2009). When evidence is relevant and otherwise admissible, it should not be excluded merely because it may also tend to prejudice the accused. *People v. Hale*, 2012 IL App (1st) 103537, ¶ 35 (citing *People v. Patterson*, 154 Ill. 2d 414, 458 (1992)). Rather, the trial court should only exclude such evidence "if its prejudicial effect substantially outweighs its probative value." *Id.* The question of

whether evidence is relevant and admissible is reserved to the trial court's sound discretion and will not be reversed absent an abuse of that discretion. *Lynn*, 388 Ill. App. 3d at 280.

¶ 47        *People v. Pelo*, 404 Ill. App. 3d 839 (2010), is instructive here. In *Pelo*, the State charged defendant with "a series of crimes involving the stalking, intimidation, home invasion, residential burglary, unlawful restraint, and aggravated criminal sexual assault of five women." *Id.* at 841. At trial, the State introduced extensive exhibits of pornography recovered from defendant's home, including 23 separate poster boards of images, gallery names, and search results, as well as two 30-second videos of various acts being performed on bound women. The *Pelo* court held that the "vast majority" of this pornography was relevant and properly admitted, since it "involved forced sex, rape, bondage, the use of foreign objects on women, and female masturbation," all of which were emulated by the perpetrator of the crimes charged. *Id.* at 864-65. The probative value of these exhibits was "very high" because it established "a backdrop of peculiar sexual interests by defendant" consistent with that of the perpetrator. *Id.* at 868. However, "a few" of the images (*e.g.*, those depicting incest, caning, and a gynecological exam) were irrelevant to the State's theory of the case and should not have been admitted. *Id.* at 862, 865.

¶ 48        In this case, the State's screenshot evidence was directly relevant to the charge of grooming, which occurs when a defendant knowingly uses any device capable of electronic data storage or transmission to solicit a child to commit a sex offense. 720 ILCS 5/11-25 (West 2014). M.G. alleged that Darius showed her a cell phone video of "a man putting his penis in a girl's mouth" before telling her "to do what the girl did in the video." Thus, it was clearly relevant that a video depicting oral sex was recovered from Darius' cell phone.

¶ 49        Additionally, as in *Pelo*, establishing a backdrop that Darius' sexual interests included oral sex was relevant because this assault involved oral sex. Darius points out that his porn videos all involved consenting adults rather than children. Notwithstanding this fact, we find that Darius' interest in oral sex rendered it more probable that he would commit a sexual assault involving oral sex than if he had no such demonstrated interest.

¶ 50        Darius additionally contends that the evidence introduced by the State on this point was excessive. He argues that a single screenshot from the oral sex video would have sufficed to make the State's point. Instead, the State showed seven screenshots from various porn videos found on his phone, as well as multiple screenshots of his search history on a porn website.

¶ 51        We do not find that the trial court abused its discretion in allowing the State to show multiple screenshots of Darius' search history and stills from pornographic videos. Initially, we note that the State's evidence in this regard was far less than the voluminous pornographic exhibits introduced in *Pelo*, the "vast majority" of which were properly admitted. *Id.* at 864. More importantly, the State's evidence was properly tailored to the crimes charged. Instead of playing the videos for the jury, the State merely showed a few relevant screenshots; additionally, the evidence was limited to searches and videos with a timestamp of June 7, 2014, the date of the assault. Accordingly, we find no abuse of discretion in the trial court's admission of pornography recovered from Darius' phone.

¶ 52                                Closing Argument

¶ 53        Darius next argues that he was deprived of a fair trial because the State said during closing argument that he "targeted" M.G. because she was "quiet" and "shy," an assertion which he claims has no basis in the record.

¶ 54      Darius acknowledges he has forfeited this issue by failing to object or raise the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). He nevertheless argues that we may consider the issue under the plain error doctrine, which allows us to review "clear and obvious" unpreserved errors when either (1) the evidence is so closely balanced that the error threatened to tip the scales against the defendant, or (2) the error "is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 55      We first consider whether any error occurred. *People v. Johnson*, 218 Ill. 2d 125, 139 (2005) ("Clearly, there can be no plain error if there is no error"). Darius first argues that there was no basis for the prosecutor's assertion that M.G. was "quiet" and "shy." We disagree. Gabriel testified that M.G. was reluctant to talk about the incident, explaining that she "shuts down when she thinks she's in trouble or when she's nervous and people [are] around." Additionally, the jury was shown the videotapes of M.G.'s CAC interviews and was able to observe her demeanor firsthand. Particularly in the first interview, M.G. was extremely withdrawn, giving single-word answers to some questions and flat-out refusing to answer most others. M.G. explicitly testified at trial that she was feeling "[s]hy" during that interview. In light of these facts, the State's characterization of M.G. as "quiet" and "shy" was a fair comment on the evidence.

¶ 56      Darius next argues that it was error to state that he "targeted" M.G. because it implies a level of premeditation and planning that is not supported by the record. We do not find any such implication in the State's argument. If the State's evidence is believed, Darius did, in fact, target M.G. by bringing her to the kitchen, showing her a porn video depicting oral sex, and then bringing her to the bathroom and telling her to imitate the actions she saw in the video.

Regardless of whether any preplanning was involved, Darius singled M.G. out as the victim of his assault. Accordingly, we find no error in the State's closing argument.

¶ 57                                    Excessive Sentence

¶ 58        Darius finally argues that his sentence of 15 years for predatory criminal sexual assault is excessive. He further argues that the trial court erred in considering M.G.'s age as a factor in aggravation, since it was a factor inherent in the offense.

¶ 59        It is well established that the trial court has broad discretionary powers in imposing a sentence. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Because the trial court has the opportunity to observe the defendant and weigh such factors as his credibility, demeanor, and mentality, we give great deference to the trial court's judgment and will not reduce a defendant's sentence absent an abuse of discretion. *Id.* at 212-13. We may not substitute our own judgment for that of the trial court simply because we would have weighed the sentencing factors differently. *Id.* at 214-15. However, we consider *de novo* the issue of whether the trial court considered an improper factor in sentencing. *People v. Chaney*, 379 Ill. App. 3d 524, 527 (2008).

¶ 60        Darius' sentence of 15 years is on the lower end of the 6-to-60-year range authorized by statute for predatory criminal sexual assault. 720 ILCS 5/11-1.40 (a)(1), (b)(1) (West 2016). Darius nevertheless argues that the trial court failed to give adequate weight to the factors in mitigation, namely, his lack of violent criminal history, his consistent employment, and the one-time nature of the offense. But it is well established that "[t]he most important sentencing factor is the seriousness of the offense, and the court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense." *People v. Charles*, 2018 IL App (1st) 153625, ¶ 45; see also *Alexander*, 239 Ill. 2d at 214-15 (appellate court acted improperly in

reducing defendant's sentence based on its finding that the trial court "gave undue weight to factors in aggravation").

¶ 61    Here, the trial court explicitly considered Darius' prior criminal history, noting that he had been sentenced to probation and then boot camp for a drug-related offense, but had no convictions in the past 11 years. The court also considered the facts of the case, as well as victim impact letters from M.G. and her mother. In balancing these factors, the court declined to impose a "low sentence," but it also declined to impose a "stiffer sentence" where Darius "would never see the street again." We find no abuse of discretion in the court's judgment in this regard.

¶ 62    Finally, Darius argues that the trial court improperly considered M.G.'s age as a factor in aggravation. A trial court may not consider a factor implicit in the underlying offense as an aggravating factor in sentencing. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9. However, the court may properly consider the nature and circumstances of the offense, including "the nature and extent of each element of the offense as committed by the defendant." *People v. Brewer*, 2013 IL App (1st) 072821, ¶ 55. "The rule that a court may not consider a factor inherent in the offense is not meant to be applied rigidly, because sound public policy dictates that a sentence be varied in accordance with the circumstances of the offense." (Internal quotation marks omitted.) *People v. Spicer*, 379 Ill. App. 3d 441, 468 (2007).

¶ 63    Thus, a sentencing court may consider "whether the victim is particularly young" even though the victim's age is an element of the sexual assault count for which defendant was convicted. (Emphasis omitted.) *People v. Thurmond*, 317 Ill. App. 3d 1133, 1144-45 (2000). For instance, *Thurmond* held that in sentencing a defendant for criminal sexual assault, the trial court did not err by recognizing that the 12-year-old victim was particularly young, since "there is a difference between being under age 18 and being significantly under age 18." *Id.*

¶ 64		Here, Darius was convicted of predatory criminal sexual assault because he was at least 17 years old and caused his sexual organ to touch a victim under 13 years old for purposes of sexual gratification or arousal. 720 ILCS 5/11-1.40 (West 2016). At sentencing, the trial court made multiple comments regarding M.G.'s age, stating: "I think to myself, what in the world can a guy see in a girl five years old, performing sex on a little girl? What in the world can a guy see in doing that?" The court further stated: "Having a young girl, age five. Every time I think about that, it makes me shake my head in wonder. A little girl age 5 do[ing] oral sex on a 25-year-old man. What in the world were you thinking about?"

¶ 65		As in *Thurmond*, we do not find the trial court's comments to be improper. Although predatory criminal sexual assault will, by definition, always involve a victim under 13, there is a difference between being under 13 and being significantly under 13. The fact that M.G. was only five years old was part of the nature and circumstances of Darius' particular offense, and, as such, the trial court was entitled to take it into account when fashioning sentence.

¶ 66		CONCLUSION

¶ 67		For the foregoing reasons, we affirm Darius' convictions and sentences.

¶ 68		Affirmed.